[No. 29788. Department Two. March 28, 1946.]

NICK BILL *et al., Respondents,* v. VICTOR GATTAVARA *et al.,*
*Appellants.*[1]

[1]Reported in 167 P. (2d) 434.

*Arthur E. Griffin,* for appellants.

*Arthur H. Hutchinson,* for respondents.

JEFFERS, J.—On November 27, 1943, Nick Bill and wife commenced an action in the superior court for King county against Lee Garner and wife, and Jim Hailstone and wife. The action, as shown by the complaint, was based upon the claimed unlawful cutting and removal of timber from plaintiffs' land by defendants. On January 2, 1945, Nick Bill and wife filed and served an amended complaint, naming as defendants Victor Gattavara and wife, Lee Garner and wife, and Jim Hailstone and wife.

The basis of the cause of action stated in the amended complaint is found in paragraphs 4 and 6, the former reading as follows:

"That within three years last past Victor Gattavara, Lee Garner and Jim Hailstone entered into a *joint venture* for the purpose of conducting logging operations, building roads, cutting, sawing and felling timber and trees, trucking logs and selling the same to the mills, and dividing between themselves in proportions agreed between themselves the moneys and revenues received from the sales of the said logs, piling, or other products of said operations. That the form of this agreement, whether oral or in writing, and its exact terms are unknown to the plaintiffs but are known to the defendants. However, all of the said defendants did

operate under the said agreement as a *joint venture* and the moneys received as gross income from the operations were divided among the defendants, each collecting his agreed share of the proceeds." (Italics ours.)

Paragraph 6 alleges in substance that defendants trespassed upon plaintiffs' land, cut and removed large first and second growth trees, as well as small growths fit for piling, poles, ties, etc., and destroyed small trees and seedlings by driving trucks and tractors and logging equipment over plaintiffs' land all of which damaged plaintiffs in the sum of seven thousand dollars. Plaintiffs ask for treble damages under Rem. Rev. Stat., § 939 [P. P. C. § 103-5].

While all the defendants were apparently served with the amended complaint, only defendants Victor Gattavara and wife and Lee Garner and wife appeared in the action. The Hailstones defaulted. Defendants Gattavara and wife and Garner and wife appeared and, by their answer, denied each and every allegation contained in paragraphs 4, 5, 6, 7, and 8 of the amended complaint.

The cause came on for hearing before the court on June 26, 1945, and thereafter, on July 19, 1945, the court made and entered its findings of fact, conclusions of law, and judgment.

In view of the fact that error is assigned upon all of the findings of fact made by the trial court, except the first three, it will be necessary to set out so much of the findings as may be necessary to an understanding of the questions raised.

Findings of fact Nos. 1, 2, and 3 merely relate to the marriages of plaintiffs and defendants, and to plaintiffs' ownership of the northwest quarter of section 8, township 23 north, range 6 E. W. M., the land from which it is claimed the timber was taken.

Finding No. 4: "That for two years, to-wit, 1942 and 1943, within the last three years, Victor Gattavara, Lee Garner and Jim Hailstone trespassed upon the plaintiff's land without right and wrongfully, and conducted logging operations thereon building roads, cutting, sawing and fall-

ing plaintiff's growing trees; selling the same as merchantable logs to the mills for the price of $17.00 per thousand feet."

Finding No. 5 consists of about five pages, and contains conclusions of the trial court and the court's observations relative to certain witnesses and their testimony. We shall set out only so much of finding No. 5 as we believe material to the issues and the questions to be determined. The court found that Victor Gattavara *employed* Lee Garner to do the logging at the price of $15.05 per thousand feet of logs delivered at the mill, and that Lee Garner *employed* one *Martin Schroeder* to do the actual logging and delivery to the mill for the sum of nine dollars per thousand feet; that Martin Schroeder in turn transferred the job to Jim Hailstone and his son Don Hailstone, and John Schroeder, with the consent and confirmation of Lee Garner; that they were instructed by *Lee Garner* to log the *entire top of Mine Hill,* which included plaintiffs' property, from the end of a logging road constructed by Lee Garner through Gattavara's lands; that Jim Hailstone, Don Hailstone, and John Schroeder operated on plaintiffs' lands around spar poles for five hundred feet radius, selected and marked for their guidance; that defendants Gattavara and Lee Garner had the general right of control over the overall logging operations of Jim Hailstone, Don Hailstone, and John Schroeder, and whether or not they exercised that right, it was their duty to do so, and any damage and wrongs to third parties caused by themselves or their employees and agents were the responsibility of Gattavara and Garner.

The court further found that Victor Gattavara and Lee Garner ordered deliveries of the logs to the sawmill of their own selection, to wit, Issaquah Lumber Company; that Lee Garner collected the sum of $15.05 per thousand feet for logs delivered to Issaquah Lumber Company by Jim Hailstone, Don Hailstone, and John Schroeder each Saturday, and out of this $15.05, paid to them for their wages $9 per thousand feet, and kept $6.05 for himself; that Victor Gattavara collected $1.95 per thousand feet, and also took directly from the mill to his home the original shipping

receipts showing the amount of logs delivered to the mill, the dates thereof, and the payments and disbursements of the money made by the mill.

The court found that Lee Garner was at the time stated an *employee* of Victor Gattavara, who was his employer, and that Lee Garner was acting within the scope of his employment for the benefit and profit of his employer and principal, Victor Gattavara; that Lee Garner was at the times stated an *employee* of Victor Gattavara, who was his employer, and Martin Schroeder, Jim Hailstone, Don Hailstone, and John Schroeder were *employees* of Victor Gattavara and Lee Garner.

The court further found that defendants, collectively and individually, are guilty of cutting 702,000 feet of standing trees, the stumpage of which was valued at $3.50 per thousand, or a total of $2,457, trespassing over an area of from eighteen to twenty-five acres; that such trespass and logging were willful, deliberate, and intentional, and plaintiffs are entitled to triple damages, or a total of $7,371, against each and all of defendants.

The trial court concluded that plaintiffs were entitled to judgment against defendants and each of them in the sum of $7,371, together with costs. The judgment entered was that plaintiffs recover of and from defendants the sum of $7,371, with interest and costs.

Defendants Gattavara and wife and Lee Garner and wife have appealed from the judgment entered.

Error is assigned on the denial of appellants' motion for a nonsuit at the close of respondents' case; in permitting respondents to introduce evidence of other suits having been brought against Gattavara; in making and signing findings of fact Nos. 4 and 5, such findings not being supported by the evidence.

Assignment of error No. 3 states:

"The court having properly made a definite finding of fact at appellants' request that no evidence was given of a joint venture, there was a fatal lack of evidence. The undisputed evidence that no trespass had occurred by any of appellants or by agent for anyone of them, judgment against them was error."

We shall first discuss assignment of error No. 3.

There can be no doubt but that the amended complaint alleged that Gattavara, Garner, and Hailstone entered into a joint venture for the purpose of conducting the operations, which respondents claim resulted in unlawfully cutting and removing timber from respondents' land. Neither can there be any doubt that the trial proceeded upon the theory that appellants were joint adventurers.

On page 10 of the statement of facts, the following appears at the time Mr. Hutchinson, attorney for respondents, was attempting to introduce exhibit No. 2:

"Mr. Griffin [Counsel for Gattavara and Garner]: If the only purpose is to show a joint venture and that this logging was done under a joint venture and whatever it shows as to the disposition of money."

Then followed a suggestion by the court, after which Mr. Griffin again stated:

"Mr. Griffin: It may be understood this is introduced for the purpose of showing joint venture between Garner, Gattavara and Hailstone. Mr. Hutchinson: Yes."

Again, on page 12 of the statement of facts appears the following at the time Mr. Hutchinson was offering exhibit No. 3:

"Mr. Hutchinson: At this time I would like to introduce plaintiff's exhibit No. 3. Mr. Griffin: For what purpose? Mr. Hutchinson: For the same purpose as designated before, the purpose not so much based on figures but showing joint venture between Gattavara and Garner. Mr. Griffin: *You are relying in this suit on a joint venture between Gattavara, Hailstone and Garner?* Mr. Hutchinson: Yes." (Italics ours.)

Respondents never asked to amend the complaint until the evidence was all in, at which time counsel for respondents moved that the pleadings be amended to conform to the proof, and the trial court, apparently considering them so amended, held appellants liable on the theory that Garner was an *employee* of Gattavara, and that the *Schroeders* and the *Hailstones* were employees of Gattavara and Garner.

It is not claimed that either Gattavara or Garner, per-

sonally, ever trespassed upon respondents' land, and certainly there is no evidence in the record to that effect.

No evidence of a contract upon which a joint venture could be based was ever introduced or testified to; in fact, there was no evidence of a joint venture having been entered into between the appellants or any of them, and apparently somewhere in the course of the trial the theory of joint venture was abandoned.

Appellants argue that the abandonment by respondents of their theory that appellants were joint adventurers was a failure of proof of a material and necessary allegation and not a variance, and fatal to respondents' right to judgment against appellants.

Rem. Rev. Stat., § 301 [P. P. C. § 84-5], provides:

"When, however, the allegation of the cause of action or defense to which the proof is directed is not proved, not in some particular or particulars only, but in its entire scope and meaning, it shall not be deemed a case of variance within the last two sections, but a failure of proof."

It is undisputed that Gattavara never met Jim Hailstone until after the alleged trespass.

Mrs. Garner testified that Jim Hailstone told her that Nick Bill claimed they had gotten over on his land; that she then called Mr. Gattavara, as she did not know anything about the lines, and she thought Mr. Gattavara, being an experienced logging man and selling timber to her husband, would know where the lines were. Mr. Garner at this time was in Alaska. Mrs. Garner further testified that she told Mr. Gattavara to come over, as she wanted to talk to him.

It conclusively appears that whatever trespass there may have been on respondents' land was committed by the partnership of Jim Hailstone, his son, and Martin Schroeder.

We shall endeavor to set out the material facts bearing upon the relation of Gattavara and Garner, and Garner and John Schroeder, Martin Schroeder, and Jim Hailstone.

On January 1, 1939, Victor Gattavara, by an instrument in writing which he referred to as a bill of sale, sold to Lee Garner all the timber owned by Gattavara on section 5, township 23 north, range 6 E. W. M. This instrument

was introduced in evidence as exhibit No. 11. By this agreement, Garner agreed to pay Gattavara $1.75 per thousand board feet for all cedar and hemlock logs. It also provided that Garner pay various sums for cedar bolts, mine props, fence posts, and cord wood. It further provided that Garner would leave stumpage where the material was sold. We understand this last provision means that Garner would leave the amount coming to Gattavara for stumpage at the place or with the concern to whom the timber was sold. In this case, $1.95 was left with the Issaquah Lumber Company for Gattavara for every thousand feet of timber delivered. The agreement further provides:

"At any time the job is completed in good faith, the 20¢ for logs and 10¢ for piling shall be returned to the purchaser."

We assume that the $1.95 is made up of $1.75 to be paid for the logs and the twenty cents mentioned in the last quoted paragraph.

 The instrument contains, among others, the following provision:

"It is further understood and agreed that the seller is not in partnership, or in any other way except such interest as he may have by virtue of this contract, with the purchaser and that the seller shall not be liable in any way for any debts, torts or operation expenses incurred by the purchaser. The purchasers are independent contractors with complete supervision and control of the work and responsible for any accidents or liabilities incurred by themselves."

While the wording of the above instrument indicates it was probably drawn by a layman, it does show that Gattavara was not entering into any relation with Garner such as joint adventurer or employer. Both Gattavara and Garner were experienced woodsmen, and neither of them questioned the validity of the instrument nor the right of Garner to make the arrangements he subsequently made for the cutting and hauling of the timber on the land referred to in the instrument.

Lee Garner testified he had been in the logging business about eighteen years, but that he had had no experience

in cruising timber; that there had been two portions of section 5 logged before he obtained the contract from Mr. Gattavara; that he did some logging in section 5 in 1939 and 1940, but not in the area adjacent to respondents' land.

He further testified that, in 1942 and the first four months of 1943, he was logging some other land of Mr. Gattavara's, known as the Reynolds timber; that this timber was about ten miles from the Mine Hill operation in section 5; that he was logging the Reynolds timber between November, 1941, and April 3, 1943; that on April 23, 1943, he went to Alaska.

He further testified that, sometime before he finished logging the Reynolds timber, he made an agreement with John Schroeder, whereby the latter was to take out the balance of the timber on section 5; that Schroeder agreed to take the timber out for so much; that Schroeder's equipment was to be used for the operation, except one truck owned by Garner; that he retained no right to control Schroeder's operations; that he had nothing to say in regard to hiring or firing the men, or in regard to the equipment used; that he was to receive $2.50 per thousand for logs hauled by his truck; that he kept up his truck and paid a man to drive it and, as stated, was to receive $2.50 per thousand for the logs hauled; that he located no spar tree used in the cutting of this timber.

We shall now refer to the testimony of John Schroeder, called as a witness by respondents. John Schroeder lives at Issaquah, and is a brother of Martin Schroeder, hereinafter referred to, and an acquaintance of Jim Hailstone. Schroeder had been logging for some other parties. He was asked what arrangement he made with Garner, and his answer was:

"A. He just offered us some more timber there for a certain price and we just kept on logging is all. Q. Where was that with reference to what is called here 'Mine Hill'? A. I don't know just what they did call Mine Hill because I don't know if that was Mine Hill when we quit. . . . Q. What was it Garner wanted from you for logging that? A. No certain settings. The price varied and we didn't always do it for the same price. . . . Q. What I want

to know is what conversation—is the operation Hailstone took over from you what you call a setting? A. A setting is what is taken from a spar tree. When you are through there you move to another tree. Q. Since the controversy has arisen you know, don't you, that the plaintiff, Bill, claims the spar tree in question was on his land? A. I did not know that. . . . Q. What price did you and Garner agree on? A. I got paid so much to put it on the truck. That is the way most small logging is done. We fall and buck it and put it on the truck. We did practically most of the work ourselves. Q. What setting had you just completed before you got to this setting? A. The one I completed was what was called the N. P., Mr. Gattavara's claim. I know it was, and that was on the north of the hill. I don't think it was Mr. Bill's claim. I think it runs west, but I was on the east side of that when I worked there. Q. Who employed you to cut the Gattavara timber? A. We went there ourselves, Mr. Hailstone and myself and my brother. . . . THE COURT: How did you know where to cut? A. We have to look over the ground. We look over the ground, etc., We have to plan our roads. . . . Q. When you started on the Gattavara timber, which counsel says was two or three spar trees from this particular setting [on respondents' land], who did you talk to about cutting that timber? A. Well, I had to talk to Mr. Garner, because he talked to Mr. Gattavara. I had to talk to someone. I naturally would not just go out in the woods and cut timber. Q. You talked to Mr. Garner and agreed on the price? A. Yes. Q. Who did you talk to when it came to setting of the last spar tree when you sold to Jim Hailstone? A. We were still on the Gattavara claim because we agreed on the price for the logging equipment and—Q. I don't care about that. *You were still on the Gattavara claim when you sold to Hailstone? A. When I quit.*" (Italics ours.)

Mr. Schroeder testified that there was about six or eight hundred feet between spar trees, and that there was a spar tree between the Gattavara timber and Bill's land when he quit; that he had not selected any other spar tree.

On cross-examination, Mr. Schroeder testified that, when he quit, the ground he was logging and the spar tree they were using were about one thousand feet from the Bill land; that, when he quit, he turned the equipment over to Hailstone, his brother, and Hailstone's son.

"Q. When you were doing that work you had full charge of the work being done, didn't you? A. I did, yes. Q. Did Mr. Garner have anything to say about the work you were doing? A. He didn't care what we did just as long as we got it logged off. That was his main idea. . . . Q. You received your pay from Mr. Garner? A. We always did, *so much per thousand.* Q. He paid you for the amount you got out, by the thousand? A. Naturally." (Italics ours.)

The witness thought Mr. Hailstone took over in 1942.

It appears from Mr. Schroeder's testimony that Garner agreed to pay him so much per thousand feet for getting out the timber on section 5; that Garner had nothing to do with the method of operation or the equipment used, except that Garner did own a truck during part of the time, for which he was allowed so much per thousand feet for logs hauled to the mill. The only right Garner had, according to Schroeder, was to stop the work. We are satisfied this last statement made by John Schroeder was a conclusion on his part, not supported by the testimony of any other witness, and not borne out by the facts.

We shall next refer to the testimony of Martin Schroeder, called by respondents. We call attention to the fact that the Schroeders were not made parties defendant in this case.

On direct examination:

"Q. Did you ever work for Mr. Garner. A. Not by the day, just as a contract logger. I have not worked for him by the day. Q. When did you first start working for him, at that time with Jim Hailstone? A. It was the fall in 1942 when we first bought out John Schroeder. . . . Q. Prior to that time do you know of your own knowledge what employment your brother [John Schroeder] had with Lee Garner? A. *He logged by the thousand, a contract logger. Q. A contract logger? A. Yes.* Q. Did he ever work by the day for him? A. No. Q. Did you ever talk to Lee Garner about this contract? A. No. I was working for wages at that time for my brother and he contracted for Mr. Garner so it was none of my business anyway. . . . Q. Did you ever talk to Lee Garner yourself about the contract, about the agreement? A. No. Q. Just what Jim Hailstone told you? A. Yes. Q. Do you know who marked

off the road? A. Not definite. Q. What? A. No. Q. Do you know who placed the spar tree? A. No. [This spar tree we assume is the one claimed to be on the Bill land, and is the one used by Hailstone and Martin Schroeder in their last operation.]" (Italics ours.)

It is apparent that finding of fact No. 5 is not supported by any testimony when it states that Lee Garner employed *Martin Schroeder* to do the actual logging, and that *Martin Schroeder* in turn transferred the job to Jim Hailstone and his son Don, and John Schroeder. The original agreement was made between John Schroeder and Garner, and thereafter John Schroeder sold his equipment to Hailstone and son and Martin Schroeder, who continued to do the logging.

We call attention at this time to the fact that neither of the Schroeders testified that Garner told them or either of them to log the "entire top of Mine Hill, which included the property of·plaintiffs."

We now come to the testimony of Jim Hailstone, called as a witness by respondents, and we may say that, while Hailstone was a defendant in the action, he did not appear in the lower court, other than as a witness, and is not an appellant.

Before discussing the testimony of Jim Hailstone, we desire to state that Mr. Bill testified that he first discovered that someone was cutting timber on his land in May, 1943; that he investigated and found Mr. Hailstone, his son, and partner, Martin Schroeder, cutting on his land. Jim Hailstone testified that on the occasion mentioned by Nick Bill, he (Hailstone), his son, and Martin Schroeder were logging.

"Q. Who else was associated with you at that time in this deal? A. Well, we were working for Lee Garner. Q. On day wages? A. No. Q. Were you in the beginning working for day wages? A. Not for Lee, no. I worked for John Schroeder in the beginning for day wages. Q. Was he working with Lee Garner at that time? A. He was working for Lee at the time. Q. Subsequently you took his place? A. I took his place. I took over his operations. Q. You bought him out? A. I went on a contract to buy the equipment from John Schroeder. Q. And John Schroeder's brother went in with you? A. Yes. Q. You were working as partners then? A. Yes, Martin Schroeder and my son.

Q. Whose equipment was being used? A. Well, the equipment was being bought under contract. Q. From whom? A. John Schroeder. The equipment was owned by the three of us. Q. What kind of a deal did you have with Lee Garner? A. We were working by the thousand as we would clear it in the woods. *We got so much per thousand for logs to put in the water*. Q. And the water was where? A. So far as I know the Issaquah Lumber Company. Q. At Lake Washington? A. Lake Sammamish. *But I don't know anything about it*—our agreement— . . . Q. Did you have any written contract? A. No. Q. Under that agreement how was the cost distributed, the selling price, rather? A. Well, we worked on a percentage, as I said, *so much per thousand. We got nine dollars. That included the yarding and loading and trucking.* . . . Q. Who located the spar poles for you? A. Well, the trees were marked, as stated before—the trees were marked and the road put in before I took over the business. Q. Do you know who did that? A. Well, I *expect* it would be Lee Garner. THE COURT: That will be stricken. Q. Did you do it yourself? A. No. Q. But it was ready there when you took over? . . . Q. Now, do you know approximately how much was taken out? A. No, I have no record. Q. Do you know how much you were paid for timber you took out and logs you took out and delivered? A. No. . . . Q. How frequently were settlements made with you, every week? A. Every week. Q. And you checked those to know that they were correct as to what was coming to you each week? A. Yes." (Italics ours.)

Mr. Hailstone further testified on cross-examination that he, Martin Schroeder, and Hailstone's son had entire charge of the logging operations; that he was hook tender and head loader, Schroeder operated the donkey, and Don Hailstone helped his father.

"Q. Did Mr. Garner have anything to say about the management of the business? A. There was no business to it. Q. Well, the operation? A. *No.* . . . Q. He didn't have anything to say as to when you should work, or who you should employ, or anything about it, did he? A. No. We had a verbal agreement as to how much we would get for putting those logs in. Q. And you agreed on the amount provided in that verbal agreement? A. Yes. Q. And you knew the other amount deducted by Garner was $1.95 for stumpage [the amount Garner agreed to pay Gattavara],

didn't you? A. That is what they say. Q. He got that regardless of how much you earned or regardless of any other consideration during all operations up there in the logging on the hill, as far as you know? A. The $1.95 was paid to Gattavara. Q. That is what I mean. That $1.95 was reserved for Mr. Gattavara. A. That is my understanding. . . . Q. You never had any agreement with Mr. Gattavara with respect to the stumpage? A. No. Q. Never any contract with him on any job? A. *No.* Q. The first time you saw Mr. Gattavara was after Nick Bill had claimed you got over the line and he came and went with you to Nick Bill's? Is that not right? A. I remember we met at Nick Bill's place. Q. That is the first time you ever saw him? A. *That is the first time I remember seeing him.* Q. That was after you completed cutting? A. Discontinued, not completed. Q. And you didn't cut any more after that, did you? A. No." (Italics ours.)

On redirect examination, Mr. Hailstone testified in part as follows:

"Q. *Did anyone tell you where to cut?* A. *No,* but if anyone understands the woods, your road is put in and your spar tree is picked— . . . Q. Did anyone tell you to deliver to the Issaquah Lumber Company? I will strike that. I think in your testimony a minute ago you said you asked Lee Garner before you took over the Schroeder contract. Is that true? A. Well, before we took over the agreement I went and asked Lee if it would be satisfactory I take over the equipment and continue on the job. Q. You did discuss what the agreement was at that time with Garner? A. I asked, yes. Of course John Schroeder had told me it was nine dollars. Q. *To be delivered where?* A. *At the Issaquah Lumber Company.* . . . Q. Did you discuss with him the terms of the contract so you would have no misunderstanding? A. Yes, we agreed on nine dollars. Q. To do what? A. Well, *we had to fall and buck that timber.* The tree stands as you see it. *We have to cut it down and into logs. Then it has to be yarded and loaded on truck and we pay the trucking to the mill."* (Italics ours.)

We desire at this point to call attention to another statement found in finding of fact No. 5: "That they were instructed by Lee Garner to log the entire top of Mine Hill." We can find no testimony in the record by any witness to

the effect that Lee Garner ever made such a statement to either of the Schroeders or to Hailstone. The only testimony which indicates that somebody told Hailstone all the timber on the hill was to be logged is that of Fred Kelly, a witness for respondents. He testified over objection:

"A. He [Hailstone] talked with me about the setup there. He said he had no lines run *but had been told all the timber on the hill was to be logged* and he also said 'If we are over the line at this point we were over it last year on the hundred and sixty.' That is perhaps the last talk I had with Mr. Hailstone. I was up there a good many times but Mr. Hailstone had pulled his donkey out and was gone. Q. Did Mr. Hailstone designate at that time who told him? A. He didn't say. He just said he was told all the timber on the hill was to be taken. . . ." (Italics ours.)

It is somewhat strange, to say the least, that if Lee Garner had ever stated to either of the Schroeders or Hailstones that they were to cut all the timber on Mine Hill, some one of these three witnesses called by respondents would not have so testified. Lee Garner denied he ever made any such statement, but said that all he told John Schroeder was that he was to cut on section 5.

There is no testimony that Lee Garner or Gattavara had anything to do with locating the spar tree claimed to be on respondents' land, and from which Hailstone and his partners were operating at the time they were stopped by Bill.

Apparently, the line between section 5 (the Gattavara land) and section 8 (the Bill land) was not marked at the time of these operations. In June of 1943, Mr. Bill had Fred Kelly, a civil engineer, run the north line of section 8, and Mr. Kelly testified that the last spar tree used by Hailstone and a certain amount of the timber cut were on Nick Bill's land.

It is difficult for us to understand, from the record, upon what basis the trial court found that anyone willfully trespassed upon the Nick Bill property. There is no testimony that Lee Garner knew that Hailstone and his

partners were over the line and in the Bill section, until Mrs. Garner wrote to him in Alaska.

As we understand the testimony of all the men who were interested in the timber to be cut on section 5, there was no duty on the part of Garner to show John Schroeder or Jim Hailstone where the line was between sections 5 and 8.

We are unable to find in the record any competent evidence to justify the following statement found in finding of fact No. 5:

"That the defendants Victor Gattavara and Lee Garner attempted by subterfuge and fraud to evade responsibility for the wrongful acts of their employees and agents by offering in evidence a purported, secret, self-serving, written contract to which the plaintiff was not a party, and of which he had no knowledge and which was not binding upon Nick Bill."

The contract referred to was the one entered into between Gattavara and Garner on January 1, 1939. Of course, Nick Bill was not a party to that instrument. It did not purport to convey any timber on Nick Bill's land or any timber in which Nick Bill was interested or to which he was making any claim. There is nothing in the record to indicate that, at the time the instrument was executed, Lee Garner intended to enter into a contract with John Schroeder or any other person or persons for the cutting and hauling of this timber. The instrument was executed some three years before the claimed trespass and, so far as appears herein, was the usual method of tranferring timber. The instrument was introduced to show that Gattavara did not employ Garner to cut the timber on section 5, and that Garner was not an employee of Gattavara, but that the timber was sold by Gattavara to Garner and was to be paid for as the timber was cut and delivered. It also shows that, Garner not being an employee of Gattavara, Jim Hailstone was not an employee of Gattavara.

It is true that Gattavara attempted in the instrument to protect himself from any claim which might be made

for damages resulting from the cutting of this timber, but we are frank to say we can find nothing in the record to indicate that the instrument was entered into between Gattavara and Garner with any fraudulent intent or any intent to evade the statutes of this state.

It does not appear that Gattavara had any control, or sought to exercise any control, over the method of operation, or that he had or claimed any rights other than that he was to receive so much per thousand for the timber at the place it was delivered. The evidence shows that, as the timber was delivered, the mill deducted the amount agreed upon and remitted it to Gattavara.

We appreciate, of course, that we did not have the benefit of seeing the witnesses, and that we have before us only the cold record. We have great respect for the ability and judgment of the trial court, but we have been unable to find in this record competent evidence to justify the findings of fact upon which the judgment entered is based.

We are of the opinion there is merit in appellants' contention that the absolute failure on the part of respondents to prove a joint venture, as alleged in their amended complaint, is fatal to a recovery against appellants. See *Oldfield v. Angeles Brewing & Malting Co.*, 72 Wash. 168, 129 Pac. 1098; *McLachlan v. Gordon*, 86 Wash. 282, 150 Pac. 441; *Eckhart v. Peterson*, 94 Wash. 379, 162 Pac. 551; *Fauver v. Blue*, 128 Wash. 586, 224 Pac. 33; and *Beadle v. Barta*, 13 Wn. (2d) 67, 123 P. (2d) 761.

We do not, however, rest our decision upon the fact that there was a fatal variation between the pleadings and the proof, but upon the fact that, in our opinion, the evidence preponderates against the findings of the trial court that either Gattavara or Garner, personally or acting through their agents or employees, trespassed upon respondents' land. In other words, we are of the opinion the evidence shows almost conclusively that Garner was not an agent or employee of Gattavara, but was purchaser of the timber on section 5; that neither John Schroeder, who first contracted with Garner to remove the balance of the timber from section 5, nor the partnership consisting of Jim

Hailstone, Don Hailstone, and Martin Schroeder, were agents or employees of either Gattavara or Garner, but were, in fact, independent contractors and acting in such capacity under an agreement with Garner.

 An independent contractor is one who, in exercising an independent employment, contracts to do certain work, according to his own methods, and without being subject to the control of his employer, except as to the product or result of his work. 27 Am. Jur. 481, § 2.

In the early case of *Larson v. American Bridge Co.,* 40 Wash. 224, 82 Pac. 294, 111 Am. St. 904, we stated:

"The general test which determines the relation of independent contractor is that he shall exercise an independent employment, and represent his employer only as to the results of his work and not as to the means whereby it is to be accomplished. The chief consideration is that the employer has no right of control *as to the mode of doing the work*; but a reservation by the employer of the right to supervise the work, for the purpose of merely determining whether it is being done in accordance with the contract, does not affect the independence of the relation. 16 Am. & Eng. Ency. Law (2d ed.), 187, 188." (Italics ours.)

We call particular attention to the case of *Hubbard v. Department of Labor & Industries,* 198 Wash. 354, 88 P. (2d) 423, and are of the opinion it sustains our conclusions herein that the Schroeders and Hailstones were independent contractors.

In the instant case, it was not claimed that either John Schroeder or the partnership was incompetent to do the work which they contracted to do.

██ ██ As a general rule, independent contractors are not within the purview of statutes, the scope of which is defined by the generic term "servants," "employees," or "agents," or by some expression which is ordinarily regarded as being applicable to a particular subdivision of the classes of persons connoted by these terms. 27 Am. Jur. 483, § 3. It is not, however, the fact of actual interference or exercise of control by the employer, but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent

contractor. 27 Am. Jur. 487, § 6. The mere retention by the owner of the right to inspect work of an independent contractor as it progresses, for the purpose of determining whether it is completed according to plans and specifications, does not operate to create the relation of master and servant between the owner and those engaged in the work. This rule is not altered by the fact that the employer may stop work which is not properly done. 27 Am. Jur. 490, § 9; *Larson v. American Bridge Co., supra.*

Although in some early cases it was thought that the doctrine of *respondeat superior* applied to the relation between an employer and an independent contractor, the authority of these few cases was soon overwhelmed by many decisions promulgating the general rule *that an employer is not liable for the torts of an independent contractor or the latter's servants.* This rule of the nonliability of an employer is based upon the theory that the characteristic incident of the relation created by an independent contract is that the employer does not possess the power of controlling the person employed *as to the details of the stipulated work*; and it is, therefore, a necessary judicial consequence that the employer shall not be answerable for an injury resulting from the manner in which the details of the work are carried out by the independent contractor. 27 Am. Jur. 504, § 27.

It is true that, as a general rule, where a trespass is committed upon the rights or property of another, *by the advice or direction* of a defendant, it is wholly unimportant what contractual or other relation exists between the immediate agent of the wrong and the person sought to be charged. 27 Am. Jur. 518, § 40.

There are other times when an employer is not relieved from liability for the acts of an independent contractor, but we are not concerned with such instances in this case.

The only testimony we have been able to find in this record which might be construed as indicating that Garner retained some right of control over the operations, is found in a statement by John Schroeder that Garner could stop the work any time he wanted to. However, in

838

view of the other testimony given by John Schroeder, the testimony of Martin Schroeder and Jim Hailstone, and the testimony of Garner, we are of the opinion the evidence preponderates against the finding that either Gattavara or Garner retained control over the operations of John Schroeder or the operation of the partnership, consisting of Jim Hailstone and son and Martin Schroeder.

It should also be borne in mind that, even though an employer has the right to stop work which is not properly done, that fact does not, in and of itself, operate to create the relation of master and servant between the owner and those engaged in the work. *Hubbard v. Department of Labor & Industries, supra.*

We see no escape from the conclusion that, under the evidence in this case, John Schroeder was an independent contractor, and so acting pursuant to his agreement with Garner, and that the partnership of Hailstone and son and Martin Schroeder was acting in the same capacity as John Schroeder.

We find nothing in the record which would bring either Gattavara or Garner within any of the exceptions to the general rule applicable to independent contractors, whereby either Gattavara or Garner could be liable for any trespass committed by John Schroeder or by Jim Hailstone, Don Hailstone, and Martin Schroeder, upon respondents' land.

In view of the conclusion we have reached, it becomes unnecessary to discuss appellants' other assignments of error or to discuss the evidence relative to the amount of timber claimed to have been unlawfully cut and removed from respondents' land.

For the reasons herein assigned, we are of the opinion the judgment of the trial court must be and it is reversed as to these appellants, and the cause is remanded to the trial court with direction to dismiss the action as to appellants Gattavara and wife and Lee Garner and wife.

DRIVER, C. J., BEALS, and ROBINSON, JJ., concur.

BLAKE, J., dissents.