[No. 4039–1.   Division One.   July 25, 1977.]

DALE M. HULING, *Individually and as Executor,*
*Respondent,* v. JOHN W. VAUX, ET AL,
*Appellants.*

*Graham, McCord, Dunn, Moen, Johnston & Rosenquist,*
*Stephen A. Crary, R. A. Moen, Davis, Wright, Todd, Riese*
*& Jones,* and *Nancy P. Gibbs,* for appellants.

*Reaugh, Hart, Allison, Prescott & Davis* and *Keith R.*
*Baldwin,* for respondent.

WILLIAMS, J.—Dale M. Huling brought this action against John W. Vaux and John L. Scott, Inc., alleging misrepresentation as to one of the boundaries of residential property purchased from Vaux by Huling and his late wife, Ruthe. Vaux and Scott denied the allegation and affirmatively pleaded the statute of limitations. Trial to the court resulted in judgment for Huling of $5,106. Vaux and Scott appeal; Huling cross–appeals.

The material facts are not in dispute. In February 1969, Ruthe Huling, without the knowledge of her husband from whom she had separated, called upon the Scott real estate firm concerning the Vaux home which it had listed for sale. She decided to buy it and signed two earnest money agreements for its purchase. In both agreements, she, as purchaser, was designated "Ruthe Huling, as her separate estate." She paid $2,000 earnest money and agreed to pay an additional $13,000 down, with the balance of $28,500 to be carried on a real estate contract with payments of $300 per month. Vaux accepted the earnest money and on April 1, 1969, he and Mrs. Huling signed a real estate contract containing those terms. She was named as the purchaser, "Ruthe Huling," and signed her name the same. Mr. Huling's name is not mentioned in any of the documents, nor did he sign any of them, although he provided the down payment from community funds. He inspected the premises, in the presence of Vaux, during the latter part of March. On April 1, Mrs. Huling took up residence in the Vaux home separate and apart from her husband, but died within 2 months, leaving the property to him.

█ Two principal questions are presented. The first is whether the trial court erred in finding that Vaux misrepresented the property because he did not disclose that the western boundary was as much as 20 feet east of a mature laurel hedge which would appear to any reasonable, prudent and diligent purchaser to be the boundary. Part of the area between the actual boundary and the hedge was owned by the City as a right–of–way; the rest, a long narrow triangular section that bordered on the true boundary,

belonged to a neighbor, Geltz. The property is located in a highly developed neighborhood in the Alki Point district of Seattle, and it does appear from the photo exhibit that the hedge marks the boundary. There is substantial evidence to support the court's finding that

> it was impossible for any reasonable and diligent purchaser to tell from the appearance of the property that the westerly boundary line was inside the hedge, or that Mr. Geltz, the neighbor, owned the long narrow triangle in the center of the front lawn of the property.

Accordingly, Vaux and his agent, Scott, who had knowledge of the true state of affairs, had a duty to disclose the information. *Alexander Myers & Co. v. Hopke,* 88 Wn.2d 449, 565 P.2d 80 (1977); *Obde v. Schlemeyer,* 56 Wn.2d 449, 353 P.2d 672 (1960); *Sorrell v. Young,* 6 Wn. App. 220, 491 P.2d 1312 (1971).

The second question is whether RCW 4.16.080(4) bars the action because it was not commenced within 3 years of the date of discovery. Initially, we observe that the purchase was a community enterprise, as the court found, even though the contract was in Mrs. Huling's name, only. *Rustad v. Rustad,* 61 Wn.2d 176, 377 P.2d 414 (1963). Vaux and Scott contend that Mrs. Huling discovered the misrepresentation when she was told by one of Scott's agents before signing the earnest money agreements that there was a strip along the side of the house which belonged to a neighbor. The precise testimony of the agent was that:

> I told her that there was a corner down there where the fence jogged, and also a little slice of land Mr. Vaux had said belonged to the neighbor, and asked her if she wanted to go out. And she said no she didn't.

Of itself, this probably does not qualify as notice, *Alexander Myers & Co. v. Hopke, supra,* particularly in view of the court's finding, based on expert testimony, that the property between the true boundary and the hedge was worth $5,106 on April 1, 1969, the date the contract was signed and Mrs. Huling went into possession. However, the court found from the following testimony of the neighbor,

Geltz, that Mrs. Huling was told of the "Geltz triangle" bordering on the true boundary while living in the house:

Q  Did you make Mrs. Huling's acquaintance during the few weeks that she lived there before she died?
A  Yes.
Q  Did you ever talk to her about this situation?
A  About the piece of property?
Q  Yes.
A  Yes, we did.
Q  About how many times?
A  Well, the first time that we talked with her, I believe, was twice to answer your question.
   The first time was because one of the kids across the street kept dumping stuff over on the property, and we asked him if he would please stop it. She came out at that time; and then probably about a week later she was asking about the property. She brought it up in a conversation.
Q  When you say the property, you mean the little strip?
A  The little strip.
Q  What did she ask you?
A  She asked some of the history of it and so on and so forth. We told her and showed her where the marks were, the stakes were in. We told her that if she wanted that that we'd sell it to her.
. . .
   At that time, [shortly before Mrs. Huling died] we discussed if she wanted the property. She said that she didn't. She said that she could care less.
Q  Did you describe to her at that time what property it was, what the stripping question was?
A  Yes. My wife went over, and the two of them went up and looked at the stakes.

■ As the court found on substantial evidence that Mr. Huling was not told of the true boundary and did not discover it until September 1971, the question becomes whether the notice to Mrs. Huling was notice to the community. We believe that it was because of the following statement in *Bowers v. Good,* 52 Wash. 384, 388–89, 100 P. 848 (1909), decided on similar facts:

In this state the management and control of community property is vested in the husband,[1] and the wife cannot, without his consent, make any valid contract with reference thereto, unless it be for necessaries for herself or the family. When, therefore, the husband knowingly permits the wife to deal with the community property, his consent to her acts and all of her acts is implied, and *he cannot afterwards hold to those which redound to his benefit and repudiate those which are against his interest.* He must accept the contract as an entirety, or repudiate it as an entirety, and in this instance he will not be permitted to say that his wife had authority to contract for the land, but did not have authority to settle and relinquish any right acquired thereunder.

(Italics ours.) *See also Lucci v. Lucci,* 2 Wn.2d 624, 99 P.2d 393 (1940).

Mr. Huling may not accept the benefit of Mrs. Huling's purchase of the property as the agent of the community, but repudiate her knowledge of the transaction. Because Mrs. Huling knew of the "Geltz triangle" before her death on May 26, 1969, commencement of the action on March 19, 1974, was too late.

Our decision makes it unnecessary to consider Huling's cross-appeal concerning the amount of damages.

The judgment is reversed and the cause dismissed.

JAMES and ANDERSEN, JJ., concur.

Petition for rehearing denied October 31, 1977.

---

[1]No longer true. Laws of 1972, 1st Ex. Sess., ch. 108, § 3, p. 245; RCW 26.16.030.