[No. 3909–II.   Division Two.   March 23, 1981.]

BLOEDEL TIMBERLANDS DEVELOPMENT, INC., *Respondent,* v.
TIMBER INDUSTRIES, INC., *Appellant.*

*Mark S. Clark* and *John Cooper,* for appellant.

*Joseph C. Finley, Gerald Shucklin,* and *Philip R. Shucklin,* for respondent.

PETRICH, J.—Treble damages for a timber trespass and damages for conversion for the timber severed from the trespass area are sought in this lawsuit.[1]

Appeals and cross appeals followed a bench trial resulting in the award of treble damages in favor of the plaintiff Bloedel Timberlands Development, Inc., against defendant Timber Industries, Inc., less a setoff and dismissal of the

---

[1]The treble damage claim was based on the following statute:

"RCW 64.12.030 Injury to or removing trees, etc.—Damages. Whenever any person shall cut down, girdle or otherwise injure, or carry off any tree, timber or shrub on the land of another person, or on the street or highway in front of any person's house, village, town or city lot, or cultivated grounds, or on the commons or public grounds of any village, town or city, or on the street or highway in front thereof, without lawful authority, in an action by such person, village, town or city against the person committing such trespasses or any of them, if judgment be given for the plaintiff, it shall be given for treble the amount of damages claimed or assessed therefor, as the case may be."

claim for treble damages against individual defendant Jack Ortolf, president of Timber Industries, as well as the dismissal of the claim against defendant Mitsui & Co. (U.S.A.), Inc., for conversion. We affirm the trial court's judgment in all respects.

Bloedel, as part of its ongoing forest management practices, decided in 1972 to sell some of its standing timber and took steps to prepare an offering of such timber in the tract known as the Wright Timber Sale. This area, carved out of a larger tract owned by Bloedel, consisted of about 60 acres of land irregular in shape. It was bounded on the north by the clearly identified Goodyear Camp railroad grade; on the east and west "by orange–glow flagging"; and the south by the southern section line of two adjoining sections. Defendant Jack Ortolf, acting in his capacity as president of Timber Industries, inspected the Wright Timber Sale in the company of John Allen, forest manager for Bloedel, who pointed out the orange–glow flagging. Allen had previously erected the orange–glow flagging for the east and west boundaries. During this inspection trip, a line of blazed trees extending between the southern termini of the east and west flag lines was observed and discussed by Ortolf and Allen. The testimony at trial was in conflict as to the representation of the blazed tree line as the section line, with Ortolf claiming Allen verbally represented the blazed tree line as the section line and Allen denying the same.

An agreement between Bloedel and Timber Industries dated November 8, 1972, entitled Timber to harvest standing timber in the Wright Timber Sale area in exchange for a cash payment of $80,000. Weather conditions as well as the timber market delayed completion of the project as originally scheduled. For additional sums of money and a deposit of $1,000 to be held as a "performance bond," time for completion was extended by written agreement to September 30, 1976. The actual operation extended into October or early November of 1976 without the benefit of a written extension. The source of the $80,000 cash consideration was from an advance in a like amount to Timber

Industries from defendant Mitsui. The advance was evidenced by a note and security agreement in favor of Mitsui on the timber to be harvested. Mitsui also agreed with Timber Industries to purchase about a million board feet of hemlock and douglas fir logs of certain sizes for export. Payment in part for such logs was by a credit on the advance at a predetermined rate. The remaining timber was to be sold by Timber Industries to other customers. This was one of other similar, although not necessarily identical, arrangements between Timber Industries and Mitsui which provided financing assistance to Timber Industries and a ready source of logs suitable for export to Mitsui.

Timber Industries contracted with logging operators for the actual logging operations. Three such operators in succession were so engaged, the last being M & M Logging owned by Ray Allen, with Stan Hull as one of its principal employees. Subsequent to the original Bloedel–Timber Industries agreement but before completion of the cutting, Crown Zellerbach, the owner of the property immediately south of the Wright Timber Sale area, located a claimed boundary line somewhat north of the blazed tree line. Once this line was established, Timber Industries respected it and refrained from any cutting south of the Crown Zellerbach line.

Jack Ortolf was seldom on the tract after the initial inspection. In the spring of 1975, he personally inspected the property. Up to that time the logging operations were primarily in the western part, progressing toward the east. At this time he and his son erected red and blue flagging slightly inside the east orange–glow flag line. His stated reason was that the orange–glow flag line was poorly marked, and the new line was a clear warning of the east boundary, the general direction in which the operation was progressing. During the summer months of 1976, David Cassida, an employee of Timber Industries, was assigned the task of supervising the operation. Cassida, on behalf of Timber, entered into the agreement with Ray Allen of M &

M Logging, the third and last logging contractor to do the cutting, loading and delivery of the timber.

However, David Cassida's knowledge of the boundaries was apparently gained from a map of the area, and the flagged boundary to the east had never been pointed out to him. Ray Allen of M & M had been advised of the boundaries, not by Cassida but by members of a prior logging crew. Because of other commitments Ray Allen left the Wright tract the end of September, and Stan Hull, an employee of M & M Logging, continued the operation. The logging operation in late September and October of 1976 progressed east beyond the eastern boundary of the Wright tract and onto Bloedel's adjoining property. The operation to the east stopped when the outer limits of the most recent yarding site had been reached. It was not until the loggers returned towards the yarding site that the orange–glow flagging and the red and blue flagging were noticed. Upon realizing a probable trespass, Timber Industries ceased logging operations in the trespassed area. The fact of the trespass onto 9.3 acres of the Bloedel property is not disputed, nor is the stumpage value of $20,000 for severed timber.

At the close of the plaintiff's case the trial court dismissed the trespass claims against defendants Ortolf and Mitsui, as well as the alternate claim of conversion against defendant Mitsui. It did award judgment against defendant Timber Industries in the amount of $60,000, thrice the value of the standing timber for the timber trespass, but allowed a setoff in the amount of $5,746 for the standing timber in the disputed area of the south boundary plus an additional $1,000, the amount of bond deposit.

Timber Industries appeals, claiming that the admitted trespass was committed with M & M Logging acting as an independent contractor rather than its agent, and further, that the trespass was unintentional and therefore not subject to treble damages. Bloedel cross–appeals the award of the setoff in favor of Timber Industries, as well as the dismissal of the trespass claim against the individual defendant Ortolf and the conversion claim against Mitsui.

We first address Timber Industries' challenge to the trial court's determination that Ray Allen and Stan Hull, the owner and employee of M & M Logging, were its agents.

■ The contract between Timber and M & M Logging specified that M & M was an independent contractor. The record shows that M & M was an entity distinct from Timber, that its employees were paid by it and that it supplied its workers with tools and equipment. Timber argues that M & M is an independent contractor as a matter of law. The trial court found, however, that fallers Stan Hull and Ray Allen were agents of Timber because Timber retained the right to control them by the presence of Cassida in the field. Factors to be considered in determining whether an agency relationship exists include: the extent of control; whether a distinct business exists; who supplies tools and equipment; the length of time worked; the method of payment; whether or not the work is part of the regular business of the employer; and the kind of occupation with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision. *Hollingbery v. Dunn,* 68 Wn.2d 75, 411 P.2d 431 (1966) (citing Restatement (Second) of Agency § 220(2) (1958)). The crucial factor is the right of control which must exist to prove agency. Control is not established if the asserted principal retains the right to supervise the asserted agent merely to determine if the agent performs in conformity with the contract. *E.g., Seattle Aerie No. 1 v. Commissioner,* 23 Wn.2d 167, 160 P.2d 614 (1945). Instead, control establishes agency only if the principal controls the manner of performance, in this case the actual cutting. *E.g., Langness v. Ketonen,* 42 Wn.2d 394, 255 P.2d 551 (1953); *Nawrocki v. Cole,* 41 Wn.2d 474, 249 P.2d 969, 35 A.L.R.2d 799 (1952); *Bill v. Gattavara,* 24 Wn.2d 819, 167 P.2d 434 (1946).

■ The holding of the court in *Hollingbery v. Dunn, supra,* concerning the determination of agency by the trier of fact is most helpful when it says at page 80:

If the facts are undisputed and but a single conclusion may be drawn therefrom, it becomes a question of law as to whether one is an employee or an independent contractor. Conversely, where the facts as to the agreement between the parties to the transaction are in dispute *or are susceptible of more than one interpretation or conclusion, then the relationship of the parties generally becomes a question to be determined by the trier of the facts.* Restatement (Second), Agency § 220, comment c (1958); 57 C.J.S. *Master and Servant* § 530 (1948); 27 Am. Jur. *Independent Contractors* § 60 (1941).

(Italics ours.)

In the present case the extent of Cassida's control appears to be either a disputed factual question or facts that are susceptible of more than one interpretation. Cassida testified that he supervised the removal of the cut logs from the tract intermittently by making certain that they were properly tagged, branded and loaded for delivery to Mitsui. This would only be control of performance to determine if it was in conformity with the contractual terms—to see if M & M was cutting the proper amount of timber. Ray Allen testified that Cassida supervised the entire logging operation nearly every day, including the cutting, branding and loading. This would show control of the manner of performance and support the agency finding. Since the question of the extent of control appears disputed, the question of agency is a factual one, and we are satisfied that there was sufficient evidence which, if believed, would support the trial court's finding that M & M Logging, Ray Allen, Stan Hull and others engaged in the actual logging operation were agents of Timber Industries.

Timber Industries next contends that the admitted trespass was casual or involuntary, entitling the plaintiff to single damages only.[2]

---

[2] RCW 64.12.040 states:

"Mitigating circumstances—Damages. If upon trial of such action it shall appear that the trespass was casual or involuntary, or that the defendant had probable cause to believe that the land on which such trespass was committed was his own, or that of the person in whose service or by whose direction the act was

■ Damages treble the stumpage value awarded for an intentional timber trespass are not necessarily punitive but attempt to compensate the owner of growing timber for premature harvesting by the trespasser. *Ventoza v. Anderson,* 14 Wn. App. 882, 545 P.2d 1219 (1976). Once a trespass is established, the burden shifts to the defendant to mitigate damages by showing that it was casual or involuntary and not willful or reckless. *E.g., Seattle–First Nat'l Bank v. Brommers,* 89 Wn.2d 190, 197–98, 570 P.2d 1035 (1977); *Smith v. Shiflett,* 66 Wn.2d 462, 403 P.2d 364 (1965). In the present case, Hull and Ray Allen admitted the trespass in their testimony. No evidence was presented by defendant to prove that the trespass was not willful or reckless. Instead, the record shows that Timber did not inform its fallers of the exact boundary, and that the fallers crossed a line that was clearly flagged, facts clearly supporting a finding of recklessness. As such, defendant failed to carry its burden of proof to mitigate damages.

■ Plaintiff Bloedel challenges the trial court's dismissal of the trespass claim against Jack Ortolf individually. No claim was made that Timber Industries was Ortolf's alter ego. Bloedel contends that Ortolf authorized or directed the trespass. It is true that one who authorizes or directs a trespass is jointly liable with the actual trespassers. *Fordney v. King County,* 9 Wn.2d 546, 557–58, 115 P.2d 667 (1941). However, in this case the record is devoid of any evidence that Ortolf directed the trespass or participated in it. Instead, he clearly marked the east boundary with red and blue flags and was not even present at the time of the logging. The unchallenged finding of the trial court is that Ortolf was never physically present at the Wright Timber Sale area or the trespass area during the time that the trespass occurred, and that he did not personally participate in the trespass or the cutting of the

done, or that such tree or timber was taken from uninclosed woodlands, for the purpose of repairing any public highway or bridge upon the land or adjoining it, judgment shall only be given for single damages."

timber. Any liability attaching would only be the vicarious liability of Timber Industries, the corporate defendant, as principal for M & M Logging and its employees; liability would not attach to the corporate officers of Timber Industries absent active participation of the officers in the trespass. The trial court was correct in dismissing the claim against Ortolf individually.

Bloedel also challenges the trial court's award of a setoff in the amount of $5,746, the value of the standing timber in the disputed area of the south boundary adjoining the Crown Zellerbach property. The findings of the trial court determined that, prior to the Bloedel–Timber Industries agreement, John Allen informed Ortolf that the south boundary of the Wright Timber Sale area was the section line, and that a line of blazed trees existed in the general vicinity of the section line. Allen did not represent that the blazed tree line coincided with the section line. The location of the section line was later disputed by a survey which indicated the section line to be further north than the blazed tree line resulting in the disputed area of approximately 4 acres containing $5,746 of standing timber. The trial court further found that at that time John Allen had doubts as to whether the section line could be accurately located or whether the blazed tree line was the true section line, but that he failed to inform Timber Industries of these doubts. In a mixed finding and conclusion the trial court held that Timber Industries elected not to cut timber in the disputed area because of the uncertainty of the boundary, and in so doing, acted reasonably under the then prevailing circumstances. Bloedel only assigned error to the mixed finding and conclusion. The unchallenged findings being verities on appeal, *Gannon v. Robinson,* 59 Wn.2d 906, 371 P.2d 274 (1962); *Baugh v. Dunstan & Dunstan, Inc.,* 67 Wn.2d 710, 409 P.2d 658 (1966), and there being substantial evidence to support that portion of the challenged finding, we are satisfied that the findings support the court's award of the setoff. *Brown v. Safeway Stores, Inc.,* 94 Wn.2d 359, 617 P.2d 704 (1980).

■ A vendor has an affirmative duty to disclose boundaries if a reasonable and diligent vendee would be misled from the appearance of the property. *Huling v. Vaux,* 18 Wn. App. 222, 566 P.2d 1271 (1977). Even innocent misrepresentations concerning boundaries entitle the purchaser to a setoff of the purchase price. *Murphree v. Rawlings,* 3 Wn. App. 880, 479 P.2d 139 (1970). Further liability can be imposed on the seller when it fails to disclose material information to the purchaser. *Sorrell v. Young,* 6 Wn. App. 220, 491 P.2d 1312 (1971). Although business practice may have obligated Timber to locate the exact boundaries by a cruise, it would appear that Bloedel had an affirmative duty to disclose that a boundary dispute existed. (This finding was not challenged.) Further, it appears that the flagged east and west lines ended very near the blazed line in the vicinity of the southern boundary. This would appear to place an affirmative duty to disclose the nature of the dispute since it would mislead the purchaser into believing that the blazed line marked the south boundary. Therefore, it cannot be said that the trial court erred in awarding the setoff.

Finally, Bloedel challenges the trial court's dismissal at the end of plaintiff's case of its claim against Mitsui for conversion. The trial court's reason was the failure to trace the identity of the logs from the trespass area into the hands of Mitsui. Bloedel contends that, as the subsequent converter of logs from Timber Industries, Mitsui is liable to Bloedel for the value of the logs at the time of conversion (not the stumpage value) where the original trespass was willful, even though Mitsui is innocent of any wrongdoing. In support, it cites *Smith v. Shiflett, supra.* Bloedel argues further that Mitsui has the burden of proving the identity of the plaintiff's property in its possession or else will be liable for the entire mass of plaintiff's appropriated property where Timber Industries, the original trespasser, confused plaintiff's property with Timber Industries' property, citing *Belmont v. Umpqua Sand & Gravel, Inc.,* 273 Or. 581, 542 P.2d 884 (1975). The authorities cited do not sup-

port Bloedel's position. In *Smith v. Shiflett, supra,* there was no problem in tracing the identity of the plaintiff's property into the hands of the innocent converter. In *Belmont v. Umpqua Sand & Gravel, Inc., supra,* there was no innocent third party purchaser from the original converter. The defendant in that case converted plaintiff's property and confused it with his own.

In order to make a prima facie case in conversion, the burden is on the plaintiff to prove a right to possess the property converted. *E.g., Junkin v. Anderson,* 21 Wn.2d 256, 258, 150 P.2d 678 (1944). An innocent third party purchaser from a willful trespasser/converter may be held liable for conversion because knowledge that the goods are converted is not essential to establish culpability. *E.g., Grays Harbor County v. Bay City Lumber Co.,* 47 Wn.2d 879, 289 P.2d 975 (1955); *Watkins v. Siler Logging Co.,* 9 Wn.2d 703, 728, 116 P.2d 315 (1941). Such a good faith purchaser may be held liable if plaintiff demonstrates intent to exercise control over plaintiff's property inconsistent with plaintiff's rights. W. Prosser, *Torts* § 15, at 83–85 (4th ed. 1971). Proof of identification of converted property in the hands of a third party purchaser must be reasonably certain. *Freightliner Corp. v. Gyles,* 268 Or. 357, 521 P.2d 1 (1974).

In the present case plaintiff failed to present sufficient evidence to establish that Mitsui did possess timber from the trespass area. Evidence disclosed that about 160,950 board feet of timber was cut from the timber trespass area during the period of late August through October of 1976. Of this amount, there was approximately 75,000 board feet of export quality logs. In October Timber Industries transported 444,000 board feet of timber from the Wright Timber Sale, and presumably from the trespass area, to its facility in the Everett area. Mitsui received 194,000 board feet, and the remaining 250,000 feet was apparently sold to other unknown customers. Pursuant to CR 41(b)(3) the trial court entered findings of fact and conclusions of law, pertinent portions of which were unchallenged by Bloedel

and provided as follows:

> During said period of August–October, 1976, at least 160,950 board feet of timber cut from the timber trespass area were removed therefrom by the defendant Timber Industries, Inc., and in October, 1976, approximately 194,000 board feet of logs were sold and delivered by Timber Industries, Inc. to the defendant Mitsui & Co. (USA), Inc., but there is insufficient evidence to prove what portion, if any, of said 194,000 board feet of logs came from the timber trespass area and what portion came from the Wright Timber sale area.

Lacking sufficient evidence to trace the identity of the trespassed timber into the hands of Mitsui, Bloedel was unable to sustain its burden of proof, and dismissal of this claim against Mitsui was proper.

The trial court's judgment is affirmed.

REED, C.J., and PETRIE, J., concur.

Reconsideration denied April 21, 1981.

Review denied by Supreme Court June 26, 1981.