Jason SCOTT, Plaintiff–Appellee,

v.

Rick ROSS, aka Rickey Allen Ross; Mark Workman; Charles Simpson, Defendants,

and

Cult Awareness Network, a California Non–Profit Corp., Defendant–Appellant.

No. 96–35050.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 11, 1997.

Decided April 8, 1998.

Paul Lawrence and Ramona M. Emerson, Preston, Gates & Ellis, Seattle, Washington, for defendant-appellant.

Eric M. Lieberman, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, New York City, for plaintiff-appellee.

David J. Bardin, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, for amici curiae American Family Foundation, HALT—an Organization of Americans for Legal Reform, Jews for Judaism, and Watchman Fellowship on Agency, Vicarious Liability and First Amendment Issues.

Before: SCHROEDER and BEEZER, Circuit Judges, and SCHWARZER,* Senior District Judge.

Opinion by Judge BEEZER; Dissent by Judge SCHWARZER.

BEEZER, Circuit Judge:

Defendant-appellant Cult Awareness Network ("CAN") appeals the jury's verdict finding CAN liable for conspiracy and negligence. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

**I**

In 1991, Kathy Tonkin and her six children joined the Life Tabernacle Church ("Life Tabernacle"), a branch of the United Pentecostal Church International. Tonkin remained a member for over a year before withdrawing. She urged her sons to withdraw from Life Tabernacle, but her three oldest sons, appellant Jason Scott ("Scott"), Thysen and Matthew, refused. At the time Scott was 18 years of age, Thysen, 16 and Matthew, 13.

Tonkin believed Life Tabernacle had a destructive effect on her sons and sought help in having them removed from the church's influence. Tonkin contacted Shirley Landa after a referral from the Seattle Community Service hotline. Landa was involved in various "anti-cult" activities and worked as CAN's Washington state "contact." A "contact" is "an unpaid volunteer who is available in given areas to speak to members of the public on behalf of CAN." CAN has described itself as "a national nonprofit organization founded to educate the public about the harmful effects of mind control as used by destructive cults." CAN operates nationally through volunteer contacts and affiliates. CAN has only four paid staff members, a full-time Executive Director and three part-time staff.

Landa referred Tonkin to Rick Ross, whom Tonkin hired to "deprogram" her three sons. Although the record is somewhat unclear as to the specific nature or origin of Landa's relationship with Ross, it is clear that Landa was aware Ross performed involuntary deprogrammings because she had seen Ross do so on the television program "48 Hours." Ross was known to, and received referrals from, other CAN members as well.

Ross performed "successful" involuntary deprogrammings on Thysen and Matthew, who were minors and therefore within their mother's control. Tonkin, Landa and Ross knew that to deprogram Scott would be more difficult legally because Scott was 18 years of age. Nonetheless, Ross, with the aid of defendants Simpson, Workman and Rotfroff, attempted to deprogram Scott. They abducted Scott and held him captive for five days, during which Ross "debated" Life Tabernacle's teachings with Scott. Tonkin planned to send Scott to a deprogramming rehabilitation center in Ohio after Ross completed the deprogramming. After several days, Scott feigned acceptance of Ross' positions, escaped and filed this suit.

Scott claimed Ross, Simpson, Workman, Rotfroff and CAN conspired to deprive him of his civil rights in violation of 42 U.S.C. § 1985(3). Scott also brought state law tort claims for negligence and outrage. Scott's claim against CAN was based upon CAN's vicarious liability for the acts of its alleged agent, Landa.

Rotfroff settled with Scott before trial. After a six-day trial, a jury found the remain-

---

\* The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

ing defendants liable for civil rights violations and negligence and awarded Scott $875,000 in compensatory damages and $4 million in punitive damages. The jury allocated 10% of the negligence liability and $1 million in punitive damages against CAN. CAN appeals.

CAN raises a variety of arguments on appeal. CAN principally focuses on the issue of Landa's agency: (i) CAN contends that the district court's jury instructions failed to follow Washington's agency law, and (ii) CAN argues that the evidence was insufficient to impose liability because the evidence demonstrated neither that Landa acted as CAN's agent nor that Landa acted within the scope of any alleged authority. CAN claims that the imposition of liability based upon Landa's acts violates CAN's First Amendment rights. CAN contends that liability may not be imposed on it pursuant to 42 U.S.C. § 1985(3). CAN challenges the admission of the testimony of Scott's expert, Dr. Anson Shupe. We reject each of CAN's arguments.

## II

 CAN argues that the district court's agency instruction did not accurately describe Washington state agency law. We review a district court's formulation of civil jury instructions for an abuse of discretion. *See Fikes v. Cleghorn*, 47 F.3d 1011, 1013 (9th Cir.1995).

 In Washington, a principal is liable for the negligent acts of its agent when the agent acts on behalf of the principal and within the scope of employment. *See Roletto v. Department Stores Garage Co.*, 30 Wash.2d 439, 191 P.2d 875, 877 (1948) (a

principal's liability rests on a showing "that the relation of master and servant exists between the person at fault and the one sought to be charged for the result of a wrong; and the relation must exist at the time, and in respect to the particular transaction out of which the injury arises."). If the agent is not acting on the principal's behalf at the time of the act in question, then the principal is not liable for that act. *Id.* This rule applies to agents who are volunteers. *See Abel v. Firs Bible and Missionary Conference*, 57 Wash.2d 853, 360 P.2d 356, 358 (1961).

The district court's agency jury instructions properly described these principles. CAN's argument that the jury instructions did not allow the jury to conclude that Landa might be an agent of CAN for some purposes, but not for the purposes of Scott's deprogramming, is not persuasive. The district court's instructions, read as a whole, properly address CAN's concern. The district court instructed:

The defendant Cult Awareness Network is sued as a principal. The plaintiff claims that Shirley Landa was acting as the Cult Awareness Network's agent in making the referral of Rick Ross to Kathy Tonkin. CAN denies that Shirley Landa was acting as CAN's agent and that Ms. Landa was at the time she made the referral acting within the scope of her authority.

If you find that Shirley Landa was the agent of CAN and was acting within the scope of authority, then any act or omission of Ms. Landa was the act or omission of CAN. If you find Ms. Landa was not acting within the scope of authority as CAN's agent, then you must find for CAN.[1]

---

1. The district court's entire agency instruction reads:

Under the law, a corporation is a person. The defendant Cult Awareness Network is a corporation. It can only act through its employees, agents, directors or officers; therefore, a corporation is responsible for the acts of its employees, agents, directors and officers performed within the scope of their authority.

An agent is a person who performs services for another person under an express agreement and who is subject to the other's control or right to control the manner and means of performing the services. The other person is called a principal.

One may be an agent without receiving compensation for services. The agency agreement may be oral or written. An agent is acting within the scope of authority if the agent is engaged in the performance of duties which were expressly or impliedly assigned to the agency by the principal. Any act or omission of an agent within the scope of authority is the act or omission of the principal.

The defendant Cult Awareness Network is sued as a principal. The plaintiff claims that Shirley Landa was acting as the Cult Awareness Network's agent in making the referral of Rick Ross to Kathy Tonkin. CAN denies that Shirley Landa was acting as CAN's agent and

The district court's reference to CAN's theory, coupled with the ensuing instruction requiring a showing that Landa "was acting within the scope of her authority," accurately states Washington agency law. These instructions differ only slightly from CAN's proposed instruction which reads: "[CAN] can be liable to Scott only if Shirley Landa was acting as its agent when she provided Scott's mother with the name and telephone number of Rick Ross."[2] The district court properly instructed the jury.

## III

CAN argues that the evidence was insufficient to impose liability on CAN because the evidence failed to demonstrate that Landa acted as CAN's agent and that she acted within the scope of her authority. We review de novo a district court's denial of a motion for judgment as a matter of law. *McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 354 (9th Cir.1996). Judgment as a matter of law is proper if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's. *Acosta v. City & County of San Francisco*, 83 F.3d 1143, 1145 (9th Cir.), *cert. denied*, — U.S. —, 117 S.Ct. 514, 136 L.Ed.2d 403 (1996). We review a district court's denial of a motion for a new trial for an abuse of discretion. *Wharf v. Burlington Northern R.R. Co.*, 60 F.3d 631, 637 (9th Cir.1995).

CAN may be held liable for Landa's acts if those acts were on CAN's behalf and within the scope of Landa's agency. *E.g., Roletto v. Department Stores Garage Co.*, 30 Wash.2d 439, 191 P.2d 875 (1948); *Thompson v. Everett Clinic*, 71 Wash.App. 548, 860 P.2d 1054, 1056 (1993) ("In order to hold an employer vicariously liable for the tortious acts of its employees, it must be established that the employee was acting in furtherance of the employer's business and that he or she was acting within the course and scope of employment when the tortious act was committed."), *review denied*, 123 Wash.2d 1027, 877 P.2d 694 (1994). In addition, "[a]gency requires that both parties consent to the relationship and that the principal exercise control over the agent." *Nordstrom Credit, Inc. v. Department of Revenue*, 120 Wash.2d 935, 845 P.2d 1331, 1335 (1993). Agency may be proven with circumstantial evidence. *Griffiths v. Big Bear Stores, Inc.*, 55 Wash.2d 243, 347 P.2d 532, 535 (1959) (citing *Smith v. Leber*, 34 Wash.2d 611, 209 P.2d 297, 301 (1949)). Our review of the record discloses evidence that supports the jury's finding of agency and that meets the district court's instruction.

The evidence demonstrates that Landa, who referred Tonkin to Ross, and who was aware of the plan to deprogram Scott, was a CAN contact person. Landa testified that she was designated as a CAN contact person for Washington state and had been on CAN's list of contact persons for years. Landa, who belonged to several other cult-related organizations, had a long-standing relationship with CAN. She was a founder of the Citizens Freedom Foundation ("CFF"), the predecessor organization to CAN, and a former member of CAN's board. Although Landa testified that she received fewer than five referrals per year from CAN, it appears she did, in fact, receive CAN referrals concerning "cult" matters in Washington.

The evidence indicates that CAN functioned through its contact people. William Rehling, CAN's president, stated that "[c]ontact people are people who are available to be contacted to encourage communication ... so that if ... someone needed to speak with a representative of CAN, they can deal with

---

that Ms. Landa was at the time she made the referral acting within the scope of her authority.

If you find that Shirley Landa was the agent of CAN and was acting within the scope of authority, then any act or omission of Ms. Landa was the act or omission of CAN. If you find Ms. Landa was not acting within the scope of authority as CAN's agent, then you must find for CAN.

2. CAN proposed the following jury instruction:

In order to hold the Cult Awareness Network liable for Scott's alleged injuries, you must find that Shirley Landa was acting as the Cult Awareness Network's agent at the time, and with respect to the particular transaction out of which Scott claims his injury arises. In other words, Cult Awareness Network can be liable to Scott only if Shirley Landa was acting as its agent when she provided Scott's mother with the name and telephone number of Rick Ross.

the contact person." When asked if contact people were "representatives" of CAN, Rehling replied that CAN's contacts were "people who are available to talk to people who have the need or desire to discuss CAN with or cults with someone" and who "facilitate communication." When asked how contact people encountered members of the public, Rehling explained that, "[a] contact person is someone that could be ... given to that person initially as just someone to speak with, or its possible that it would work the other way, that somebody, the CAN office, might suggest they speak to a contact person. Both of those are possible." Rehling stated that CAN authorized its contact people to represent to the public that the contact people were assisting on behalf of CAN.

The evidence shows CAN controlled the appointments of its contact people and had the right to terminate them. Rehling testified that CAN chose its contact people by considering their commitment to CAN, their willingness to serve as contact people, their history of good relations with CAN, and their perceived agreement with CAN's tenets. Rehling thought that CAN might have issued policies concerning how contact people should conduct themselves with the public and that the contact people might have to sign agreements with CAN. Rehling acknowledged that CAN could remove from its list of contact persons any contact person who engaged in misconduct.

The evidence indicates that it was CAN's practice to refer people to deprogrammers, including Rick Ross, and that Ross was known to engage in involuntary deprogramming. Tonkin said Landa described Ross as "a very successful deprogrammer" with a "very, very high success rate." Martin Butz, a CAN employee who answered CAN's national hotline, estimated he referred a "few hundred" people to "exit counselors," *i.e.,* deprogrammers who did not engage in forcible interventions. Butz acknowledged that he referred people to Rick Ross. Although Butz claimed he was unaware of Ross engaging in *illegal,* involuntary deprogramming, Butz admitted he was "aware" of the "48 Hours" television program concerning Ross.

That program reported that Ross restrained a fourteen-year old boy and conducted an involuntary, although not illegal, deprogramming. Butz said that after the broadcast of the "48 Hours" program, people requested Ross' name and telephone number from him. Although Butz said he had not referred anyone to Ross in the past two and a half to three and a half years, Butz admitted providing the requested information on perhaps six occasions.

Although Ross did not specifically recall receiving any referrals from Butz, Ross acknowledged that he "may have received referrals for information from the Cult Awareness Network." He also remembered "receiving some calls and people said that they—they may have said that they had talked to CAN or some other organization." When asked if CAN's referrals to him led to "exit counseling" or deprogramming, Ross acknowledged that the referrals "for information" "may have resulted" in his being "retained ... for some purpose," such as voluntary "exit counseling." [3]

Other evidence was admitted that concerned Ross' contact with CAN and CAN's awareness of Ross. For example, Ross had applied to be the executive director of CFF. Ross acknowledged he corresponded with Priscilla Coates, CFF's executive director. In a letter to Coates, Ross indicated that he wanted to complete two more exit counseling cases that year in order to support one of his projects, and wrote, "a couple of cases right now would be great. Do you know of anything?" In the letter, Ross stated that Cynthia Kisser, CAN's executive director, had given him a "couple of referrals." Ross included in his promotional materials testimonials from CAN directors. Coates stated in a testimonial that she had "referred many families, friends, siblings, and inquiries of all kinds to Rick." Ross attended CAN conferences in Los Angeles, Oklahoma City, Chicago and Dallas.

In summary, there is sufficient evidence, if believed by the jury, to establish that Landa was a CAN contact person; that CAN func-

---

**3.** Ross even stated that he "may have been considered a contact person for CAN in [his] capacity at Jewish Family and Children Service during the early '80s," although he was not sure who considered him as such.

tioned through its contact people; that CAN members routinely referred people to deprogrammers, including Ross; that Ross conducted involuntary deprogrammings; and that CAN was aware of Ross and the fact he conducted involuntary deprogrammings. The evidence was sufficient to support the jury's verdict on the question of Landa's agency with respect to her referral of Tonkin to Ross.

## IV

CAN argues it should not be held liable for Scott's injuries because, even if Landa acted as CAN's agent, Landa's referral of Tonkin to Ross was an act beyond Landa's authority as a CAN agent. However, as discussed *supra*, the evidence establishes that CAN members routinely referred callers to deprogrammers, including involuntary deprogrammers; thus, Landa's referral of Tonkin to Ross did not violate CAN's actual practices. CAN's "official" policy prohibiting involuntary deprogramming neither undermines the evidence concerning CAN's practices nor precludes imposition of vicarious liability. *E.g., Smith v. Leber*, 34 Wash.2d 611, 209 P.2d 297, 303 (1949) (respondents cite no case holding that an express prohibition against the doing of a certain act absolves an employer from liability, where such an act was done in conjunction with other acts which were within the scope of the duties an employee has been instructed to perform.) Because Landa acted within the scope of her authority, there is no reason to set aside the jury's verdict.

## V

CAN argues for the first time on appeal that the imposition of vicarious liability for Landa's acts violates CAN's First Amendment speech and associational rights. Generally, we do not consider issues raised for the first time on appeal. *Bolker v. Commissioner*, 760 F.2d 1039, 1042 (9th Cir. 1985). Nonetheless, we have discretion to review issues not raised below when, as here, "the issue presented is purely one of law and either does not depend on the factual record

developed below, or the pertinent record has been fully developed." *Id.*

CAN relies primarily on *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). *Claiborne* involved a boycott against certain white businesses in Mississippi by African-American residents. After discussing the protestors' speech and associational rights, the Supreme Court stated that the NAACP representative was not liable for his speech because it "did not exceed the bounds of protected speech." *Id.* at 929, 102 S.Ct. at 3434. Because the NAACP's spokesman was not liable, the NAACP, as his principal, could not be held liable. Although the NAACP and its members had well-recognized associational rights, the NAACP, "like any other organization," would be held liable for any actionable conduct of its agents "undertaken within the scope of their actual or apparent authority." *Id.* at 930, 102 S.Ct. at 3434.

*Claiborne* is distinguishable from the instant case. CAN is not being held liable for any of its speech or associations, but rather for its agent's involvement in Scott's deprogramming. In *Claiborne*, the evidence did not tie the NAACP to the purportedly illegal acts of its representative; here, CAN has been directly linked to the acts of its agent, Landa.

## VI

CAN argues that: (i) it cannot be held vicariously liable for conspiracy under § 1985(3), and (ii) even if it could be held liable, the evidence presented fails to establish that CAN engaged in any conspiracy to violate Scott's rights.

### A. Vicarious Liability

CAN argues that vicarious liability cannot be imposed under § 1985(3).[4] Although CAN raises this issue for the first time on appeal, we may review purely legal issues raised for the first time on appeal if the record was fully developed at trial. *Bolker v. Commissioner*, 760 F.2d 1039, 1042

---

4. It appears that CAN could have challenged—perhaps successfully—the § 1985(3) judgment against it on other grounds. However, CAN has waived any such arguments by failing to raise them on appeal.

(9th Cir.1985). We review de novo questions of law. *United States v. Gutierrez*, 116 F.3d 412, 415 (9th Cir.1997).

Neither CAN nor Scott cites to binding authority concerning the imposition of vicarious liability under § 1985(3). Instead, both parties rely on cases concerning 42 U.S.C. § 1983. CAN argues that liability does not arise under § 1985 on theories of respondeat superior or vicarious liability. Scott contends that CAN's liability is premised on CAN's policy and practices condoning involuntary programming; in effect, Scott attempts to graft § 1983 principles concerning municipal liability onto § 1985(3). We have yet to adopt either view in this circuit.

■■■■■ The parties have not offered persuasive reasons why we should adopt their arguments. We are reluctant to adopt wholesale § 1983 principles with respect to § 1985(3) in light of the fact that, unlike § 1983, § 1985(3) was intended to reach "private conspiracies aimed at interfering with rights constitutionally protected against private, as well as official, encroachment." *United Bhd. of Carpenters v. Scott*, 463 U.S. 825, 833, 103 S.Ct. 3352, 3358–59, 77 L.Ed.2d 1049 (1983). With a few exceptions, claims brought pursuant to § 1985(3) do not require state action. *See id.* at 830, 103 S.Ct. at 3357 (the exception is that a conspiracy to infringe First Amendment rights does not violate § 1985(3) unless there is state involvement or the conspiracy's aim is to influence state activity). The same cannot be said with respect to § 1983. The policy and practice limitation on municipal liability under § 1983 shields governmental agencies from liability for unauthorized actions of its officers to a greater extent than traditional respondeat superior principles do; given this, to replace traditional principals of vicarious liability with a "policy and practice" theory of liability with respect to private actors strikes us as suspect.

To adopt CAN's argument that there is no vicarious liability under § 1985(3) would be tantamount to adopting a rule that private organizations or entities can never be liable under § 1985(3). That is not the law of this circuit. In *Life Insurance Co. of North America v. Reichardt*, 591 F.2d 499 (9th Cir.1979), we reversed the dismissal of plaintiff's complaint where plaintiff was a female disability insurance policyholder who sued the California State Insurance Commissioner and several insurers. In *Fobbs v. Holy Cross Health System Corp.*, 29 F.3d 1439 (9th Cir.1994), we reversed the dismissal of plaintiff's complaint where plaintiff was a black physician who sued a hospital and members of the hospital's supervisory committee. Although we did not explicitly address the issue of vicarious liability in these cases, it is apparent that in absence of some type of vicarious liability, the entity defendants could not have been liable.

We conclude that vicarious liability may be imposed on CAN in this action. Under either traditional principles of respondeat superior or "policy and practice" principles, CAN would be liable. Landa acted as CAN's agent, and Landa acted in accordance with CAN's practice of referring people to involuntary deprogrammers.

## B. Sufficiency of the Evidence

■■■ CAN argues that even if it is liable under § 1985(3) for Landa's acts, the evidence fails to establish that Landa was aware of any plan to deprogram or abduct Scott, and that even if she was aware of this plan, she did not participate in it. The record shows otherwise.

■■■ A plaintiff alleging a conspiracy under § 1985(3) must establish: the existence of a conspiracy to deprive the plaintiff of the equal protection of the laws; an act in furtherance of the conspiracy; and a resulting injury. *See Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir.1992) (citing *United Bhd. of Carpenters v. Scott*, 463 U.S. 825, 828–29, 103 S.Ct. 3352, 3355–57, 77 L.Ed.2d 1049 (1983)). "A conspiracy can be inferred from conduct and need not be proven by evidence of an express agreement." *Ward v. Equal Employment Opportunity Comm'n*, 719 F.2d 311, 314 (9th Cir.1983).

The record shows Landa was involved in the agreement to deprogram Scott and thereby violate his civil rights. Landa referred Tonkin to Ross, and Landa was aware of Ross' methods. Tonkin indicated that Landa referred to Ross as "a very successful deprogrammer" with a "very, very high suc-

cess rate." Landa knew Ross conducted involuntary deprogramming, as indicated by the fact she saw the "48 Hours" program in which Ross involuntarily deprogrammed a minor. Landa was involved in the deprogramming of Scott's younger brothers. Tonkin discussed and planned the deprogramming of Scott with Landa. Landa advised Tonkin of the possible legal problems involved in Scott's deprogramming. Landa told Tonkin that the only way properly to deprogram Scott was to abduct and deprogram him. The fact Ross contacted Landa for "legal advice" after his arrest is further evidence of her complicity. *See United States v. Calabrese,* 825 F.2d 1342, 1348 (9th Cir.1987) (knowledge of and participation in conspiracy can be inferred from circumstantial evidence and from defendant's actions) (citation omitted).

CAN's reliance on Landa's testimony to establish that she was not involved in the alleged conspiracy is not persuasive. In denying CAN's motion for judgment as a matter of law or for a new trial, the district court noted that the jury was justified in discounting Landa's testimony given "the numerous illustrations of Landa'[s] bias and hostility, as well as the inconsistencies in her testimony."

## VII

 CAN argues that the admission of the testimony of Dr. Shupe, whom Scott proffered as an expert in the "anti-cult movement," violated Rules 702 and 703 of the Federal Rules of Evidence. In general, we review the admission of expert testimony for an abuse of discretion. *United States v. Alonso,* 48 F.3d 1536, 1539 (9th Cir.1995).

 CAN moved in limine to exclude Dr. Shupe's testimony, but CAN did not object to his testimony at trial. We have "reject[ed] an invariable requirement that an objection that is the subject of an unsuccessful motion in limine be renewed at trial." *Palmerin v. City of Riverside,* 794 F.2d 1409, 1413 (9th Cir.1986). Instead, "where the substance of the objection has been thoroughly explored during the hearing on the motion in limine,

and the trial court's ruling permitting introduction of evidence was explicit and definitive, no further action is required to preserve for appeal the issue of admissibility of that evidence." *Id.; see also United States v. Lui,* 941 F.2d 844, 846 (9th Cir.1991).

The issue of the admissibility of Dr. Shupe's testimony was not properly preserved for review because the district court's ruling lacked the necessary definitiveness. When Scott sought to qualify Shupe as an expert at trial, the district court stated that, "in my view of the rules, Counsel, it is up to the jury to determine the expertise if there is no objection to [Dr. Shupe's] testimony." In other words, although Scott was not precluded from calling Dr. Shupe as an expert, the district court would consider objections to specific testimony elicited. Despite this warning to CAN's counsel, CAN failed to object to Dr. Shupe's testimony on Rule 702 or 703 grounds. Later, the district court expressed surprise at CAN's failure to object during Dr. Shupe's testimony and noted its willingness to consider objections to Dr. Shupe's testimony. Even then, at the district court's prompting, CAN failed to object or to move to strike Dr. Shupe's testimony. Rather, CAN's attorney admitted that after the denial of CAN's motion in limine, CAN made a "strategic decision" to "deal with it." In these circumstances, we review the admission of evidence for plain error. *Cf. United States v. Alonso,* 48 F.3d 1536, 1539 (9th Cir.1995). The fact that the district court might have sustained objections, had they been made, does not mean that the district court wrongly admitted Dr. Shupe's testimony.

 Turning to the merits of CAN's argument, CAN contends that Dr. Shupe's testimony was inadmissible under Rule 702 of the Federal Rules of Evidence. Rule 702 allows for the admission of expert testimony that will aid the trier of fact in understanding the evidence or determining a fact in issue.[5] There are four factors to consider in determining if expert testimony will assist the

---

5. Rule 702 provides:
 If scientific, technical, or other specialized knowledge will assist a trier of fact to understand the evidence or to determine a fact in

issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

trier of fact: (i) whether the expert is qualified; (ii) whether the subject matter of the testimony is proper for the jury's consideration; (iii) whether the testimony conforms to a generally accepted explanatory theory; and (iv) whether the probative value of the testimony outweighs its prejudicial effect. *United States v. Castaneda,* 94 F.3d 592, 595 (9th Cir.1996) (citing *United States v. Rahm,* 993 F.2d 1405, 1409 (9th Cir.1993)).

 The district court properly admitted Dr. Shupe's testimony. Shupe is qualified; he is a professor of sociology who has studied and written about the "anti-cult movement" for the last 19 years. *See Thomas v. Newton Int'l Enters.,* 42 F.3d 1266, 1269 (9th Cir. 1994) (Rule 702 "contemplates a broad conception of expert qualifications."). CAN's argument that Shupe did not specifically study CAN or its practices does not undermine Shupe's credibility. *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1142 (9th Cir.1997) (fact that expert's opinions were based on data collected by others was immaterial to determining whether opinions were admissible).

 Shupe's testimony was proper for the jury because he testified regarding matters beyond the general knowledge of jurors. That is, Shupe discussed the history and general practice of deprogramming and the origin and practices of the "anti-cult movement." That CAN denies either endorsing or performing violent deprogrammings does not make Dr. Shupe's testimony excludable. This matter was taken up on cross-examination, and the merits of Dr. Shupe's opinion was properly challenged by showing his inability to point to specific CAN literature endorsing violent deprogrammings. Shupe's opinion as to the entrepreneurial nature of deprogramming and its origins in religious intolerance was not inappropriately admitted. Just as CAN questioned the credibility of Dr. Shupe, so too the jury was free to disregard his testimony.

 Dr. Shupe's testimony conformed to a generally accepted explanatory theory, as indicated by his citation to other authors, primarily collaborators, who have discussed theories consistent with his. Because Dr. Shupe provided the jury with useful information about the anti-cult movement and was available for cross-examination, defeating in large part any concerns of prejudice, the probative value of his testimony outweighed any prejudicial effect.

 CAN argues that the admission of Dr. Shupe's testimony violated Rule 703 of the Federal Rules of Evidence. Rule 703 allows an expert witness to form an opinion based on facts or data either before or at the hearing. The facts or data relied upon need not be otherwise admissible if they are "of a type reasonably relied upon by experts in a particular field." Fed.R.Evid. 703.[6] CAN argues that Dr. Shupe's opinions were based on newspaper articles, certain pretrial testimony and conversations with colleagues, all of which, CAN contends, fail to constitute evidence "reasonably relied" on by experts in Dr. Shupe's discipline. CAN argues that Shupe's testimony lacks any indicia of trustworthiness to merit consideration of hearsay materials. However, Shupe's citations to his extensive studies and to his collaboration with other academics as the basis for his opinions suffice to merit admission of his testimony.

The judgment of the district court is AFFIRMED.

SCHWARZER, Senior District Judge, dissenting:

I respectfully dissent.

The evidence presented at trial was insufficient to support the jury's finding that CAN was liable for the consequences of Landa's negligent referral. Under Washington law, to impose liability on a principal for the acts of its agents, a plaintiff must establish not only the existence of an agency relationship but also that "the relation ... exist[ed] at the time, and in respect to the particular transaction out of which the injury arises." *Hamm*

---

6. Rule 703 states:
 The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

*v. Camerota,* 48 Wash.2d 34, 290 P.2d 713, 715 (1955); *Roletto v. Department Stores Garage Co.,* 30 Wash.2d 439, 191 P.2d 875, 877 (1948).[1] There was ample evidence for the jury to find that Landa, as a CAN-appointed contact person, was CAN's agent. However, there was no evidence from which the jury could find that Landa acted as CAN's agent "in respect to the particular transaction out of which the injury arises." The relevant evidence showed the following:

Landa belonged to several cult-related organizations in addition to CAN. She was listed on the Seattle crisis hotline as "Parents Awareness." Tonkin called Community Services and then reached Landa on her private line. Tonkin had never heard of CAN when she called Landa and did not learn about CAN until later. She testified she thought Landa was involved with Community Services, not CAN. Scott presented no evidence, direct or circumstantial, that Landa was acting on directions or instructions of CAN, or that CAN knew of Landa's referral of Tonkin (or, for that matter, of other similar referrals by her) to Ross, much less that CAN gave its approval.

The majority concludes that the jury could find Landa was CAN's agent with respect to her referral of Tonkin because Landa was a contact person, CAN functioned through contact persons who referred people to deprogrammmers including Ross, Ross conducted involuntary deprogrammings, and CAN was aware that Ross conducted involuntary deprogramming. That reasoning, however, requires a leap of logic. It might be supportable if Tonkin had called CAN and been referred to Landa who then referred her to Ross. However, that did not occur. On this record, Landa's connection with CAN was irrelevant to her dealings with Tonkin and Ross.

A hypothetical might help make the point. Suppose X is a delivery driver for the ABC bread company and also for the DEF bread company. He drives the identical route for each but alternates serving the two companies, on one day he delivers for ABC and the next for DEF. On a day on which he delivers for ABC, he hits a pedestrian. Surely DEF could not be held liable (along with ABC) although X is its agent and performs the identical service for DEF as for ABC. The same is true in this case: CAN cannot be held liable although Landa was its agent. There is no evidence that in referring Tonkin to Ross, Landa was acting as CAN's agent.

Accordingly, I would reverse.

---

1. The majority relies upon this interpretation of Washington state law in upholding the jury instructions, *see* Op. at 1280; however, it ignores this interpretation in finding the evidence sufficient to uphold the liability verdict.