**AIRBORNE FREIGHT CORPO-RATION, d/b/a Airborne Express, Plaintiff,**

v.

**ST. PAUL FIRE & MARINE INSURANCE COMPANY, Defendant.**

No. C03–2390L.

United States District Court, W.D. Washington, at Seattle.

March 12, 2007.

Michael E. Gossler, Scott E. Feir, Montgomery Purdue Blankinship & Austin PLLC, Seattle, WA, for Plaintiff.

John Patrick Hayes, Forsberg & Umlauf, Seattle, WA, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

LASNIK, District Judge.

### I. INTRODUCTION

This matter comes before the Court on plaintiff Airborne Freight Corporation's ("Airborne") "Motion for Summary Judgment" (Dkt.# 54) and defendant St. Paul Fire & Marine Insurance Company's ("St. Paul") "Cross Motion for Summary Judgment" (Dkt.# 58). This is an insurance coverage dispute stemming from Airborne's settlement of two lawsuits against it by National Fulfilment, Inc. and Sur La Table. Airborne is an insured under a cargo legal liability insurance policy (the "Insurance Policy") issued by St. Paul. See Dkt. # 19 (Hayes Decl.) at Ex. 1. St. Paul refused to pay on the Insurance Policy, and as a result, Airborne commenced this action. On September 23, 2004, the Court granted St. Paul's motion for summary judgment and dismissed all of Airborne's claims for: (1) breach of contract; (2) bad faith; (3) and violation of the Washington Consumer Protection Act. See Dkt. # 34. Airborne appealed this ruling to the Ninth

Circuit Court of Appeals, which affirmed, reversed and remanded the Court's judgment in part. *See* Dkt. # 63. After remand, the parties filed another pair of summary judgment motions, which are now before the Court for consideration. For the reasons set forth below, the Court denies Airborne's motion for summary judgment and grants St. Paul's cross-motion for summary judgment.

## II. DISCUSSION

### A. Background

#### 1. The NFI litigation

In 1999, Airborne entered into an agreement with the United States Postal Service (the "USPS") by which Airborne would deliver a seller's product from the seller's distribution point to the United States post office nearest the customer's home. *See* Dkt. # 23 (Gregorich Decl.) at ¶ 3. The USPS would then make final delivery to the customer. *Id.*

In December of 1999, Airborne entered into an agreement with National Fulfillment, Inc. ("NFI"), known as the "Airborne@Home Service Agreement," whereby Airborne would transport products ordered by customers through NFI to local post offices for final delivery by the USPS. *Id.* at ¶ 4; Exhibit B. During NFI's shipping arrangement with Airborne, NFI reported over four thousand customer complaints regarding products that had been shipped by NFI, but not received by customers. *See* Dkt. # 19 (Hayes Decl.), Ex. 3, ¶ 14. Initially, Airborne paid NFI almost $50,000 on the complaints, but as they continued, Airborne stopped making payments on the complaints. *See* Dkt. # 23 at ¶ 4. As a result, in March of 2001, NFI sued Airborne in Tennessee state court. *See* Dkt. # 19 at Ex. 3.

Airborne notified St. Paul of NFI's lawsuit and requested a defense and indemnification for legal liability arising from it, and in turn, St. Paul provided defense under a reservation of rights. *See* Dkt. # 23 at 5. Ultimately, in 2002, NFI and Airborne settled the lawsuit, with Airborne agreeing to offset the $525,000 NFI owed Airborne in freight charges, attorney's fees and interest, by $255,000 in damages arising from approximately 3,500 NFI customer complaints. *Id.* at 6–7. After executing the settlement with NFI, Airborne requested indemnity from St. Paul for the $255,000 credit to NFI. *See* Dkt # 22 (Gossler Decl.) at Ex. G. St. Paul denied the request, claiming: (1) none of the complaints covered by the NFI settlement agreement met the applicable deductible in paragraph 4 of the cargo legal liability section of the Insurance Policy; and (2) the losses were not covered because they did not arise from loss or damage while under Airborne's "care, custody, and control" as required by the scope of coverage paragraph in the cargo legal liability section of the Insurance Policy. *Id.*

#### 2. The Sur La Table litigation

On June 9, 2000, Airborne entered an @Home Service Agreement with Sur La Table that was substantively identical to the NFI Agreement. *See* Dkt. # 23 at Ex. E. Numerous Sur La Table customers complained that their merchandise arrived damaged due to poor packaging. *See* Dkt. # 23 at ¶ 9. Sur La Table subsequently stopped paying Airborne for its freight services. *Id.* Airborne sued Sur La Table for those unpaid charges, costs and attorney's fees, seeking $24,000, and Sur La Table asserted a counterclaim for lost or damaged shipments. *Id.* Airborne and Sur La Table ultimately settled the lawsuit by agreeing that Sur La Table was entitled to $25,000 in damages for lost or damaged shipments, which was paid in the form of a $24,000 credit for withheld

freight charges, costs and attorney's fees, and a check for $1,000. *Id.* Airborne claims St. Paul owes Airborne $22,500, which consists of the $25,000 settlement less the $2,500 deductible. *Id.* St. Paul has not paid on Airborne's Sur La Table claim. *Id.*

### 3. Procedural Summary

In July of 2004, Airborne and St. Paul filed motions for summary judgment. *See* Dkt. # 18 (St. Paul's summary judgment motion for dismissal of all claims); Dkt. # 21 (Airborne's summary judgment motion on breach of contract claim). On September 23, 2004 the Court granted St. Paul's motion for summary judgment, denied Airborne's motion, and entered judgment in favor of St. Paul. *See* Dkt. # 34. In this order, the Court dismissed Airborne's breach of contract claim because the losses at issue occurred after Airborne had delivered the packages to USPS, and therefore the Court found that the packages were not under Airborne's "care, custody and control" and in turn were not covered by the Insurance Policy. *Id.* at 9. The Court also granted St. Paul's motion for summary judgment on Airborne's bad faith and consumer protection act claims. *Id.* at 9–10.

On November 4, 2004, Airborne appealed the Court's ruling to the Ninth Circuit. *See* Dkt. # 38. On December 26, 2006, the Ninth Circuit affirmed in part, reversed in part, and remanded the action to this Court for further proceedings. *See* Dkt. # 63 (Ninth Circuit's Judgment). After the remand, discovery closed on December 11, 2007 (Dkt.# 53) and both parties filed motions for summary judgment, which are now before the Court.

### B. Analysis

■ In its published opinion, the Ninth Circuit framed two issues of material fact for resolution on remand: [1] "whether the United States Postal Service (USPS) was a covered agent of Airborne and [2] whether Airborne retained responsibility and liability for packages once they were handed off to the USPS for delivery to the final consignee." *Airborne Freight Corp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 634, 635 (9th Cir.2006).

The issue of "whether Airborne retained responsibility and liability for packages once they were handed off to the USPS for delivery to the final consignee," is relevant to St. Paul's liability in this matter because under the Insurance Policy, St. Paul has to provide coverage only if Airborne is responsible and/or liable to NFI and Sur La Table for their shipments. Paragraph 2 in Section II (Cargo Legal Liability) of the Insurance Policy contains the relevant provision:

### 2. SCOPE OF COVERAGE

To cover the legal liability of the Assured for Ad Valorem/Declared Value shipments arising under contract and/or documentation such as Air Freight Bill of Lading, Airway Bill, Bill of Lading or other forms of shipping documents, Freight Receipt, and/or Tariffs filed with government authorities (including while in the care, custody, and control of he [sic, the] Assured for the purpose of container loading and consolidation prior to the shipment, subsequent transshipment handling and final container unloading and deconsolidation), and/or public law for loss or damage to lawful goods and/or merchandise and/or property while in their care, custody, and control, acting as, but not limited to Warehousemen, Common Carriers, Bailees, Truckman, Freight Forwarders, NVOCC (Sea & Air), or otherwise. *Insurance is to attach from the moment the Assured becomes responsible and/or*

*liable and continues until such responsibility or liability ceases.*

*See* Dkt. # 24 (Reilly Decl.), Ex. A at 2 (emphasis added).

Based on the emphasized language above, St. Paul provides coverage when Airborne is liable for its shipments. Therefore, whether the packages at issue in this case are covered depends upon whether Airborne remained liable to NFI and Sur La Table when the USPS took over delivery of the packages.[1] The scope of Airborne's liability to NFI and Sur La Table is contained in Airborne's @Home Service Agreements. *See* Dkt. # 59 (Second Hayes Decl.) at Ex. 1. Airborne's @Home Service Agreements with NFI and Sur La Table are substantively similar, and paragraph 33 in both agreements contains the following limitation of liability provision:

> 33) By signing this Agreement, Shipper [NFI or Sur La Table] agrees to be bound by all provisions of the Carrier's [Airborne's] Service Guides and tariff. CARRIER'S LIABILITY IS LIMITED TO $100 PER PACKAGE ON DOMESTIC SHIPMENTS, OR ACTUAL VALUE, WHICHEVER IS LESS, SPECIAL OR CONSEQUENTIAL DAMAGES ARE NOT RECOVERABLE. *Carrier's Service Guides and tariff govern Carrier's limits of liability,* shipment packing, unacceptable goods, claims and time limits for filing, inspections, reweigh and rates and charges, among other things. Shipper is referred to Carrier's Service Guides and tariff for full details.

*Id.* (capitalization in original; underlining added for emphasis). Based on paragraph 33, the scope of Airborne's liability to NFI and Sur La Table is incorporated from Airborne's Service Guide. In Airborne's Service Guide, paragraph B of the "Limit of Liability and Liability Not Assumed" section states:

> B.   LIABILITY NOT ASSUMED: ...
> 2. *Airborne Express shall not be liable for loss, damage, destruction, delay, theft, mis-delivery, non-delivery, or any other result not caused by the actual negligence of itself, its agents or employees,* provided that, upon proof by shipper that the shipment was received by Airborne Express in an undamaged, disease-free, and proper shipping condition, and was lost, damaged, destroyed, stolen, delayed, mis-delivered or not delivered, while in Airborne Express' possession, Airborne Express shall have the burden of proving that such loss, damage, destruction, theft, delay, mis-delivery, or non-delivery, was not the result of its negligence.

*See* Dkt. # 23 (Gregorich Decl.), Ex. A at 8 (emphasis added). Under this provision, Airborne is only liable to NFI and Sur La Table if the loss is caused by Airborne, its agents or employees. In this case, there is no dispute that the USPS was not acting as Airborne's employee, nor was the USPS acting as part of Airborne itself. The central question is whether the USPS is Airborne's agent, because if the USPS is Airborne's agent, then Airborne is liable[2] to NFI and Sur La Table for the USPS's actions and St. Paul must provide coverage. If USPS is not Airborne's agent, then Airborne is not liable to NFI and Sur La Table under Airborne's Service Guide, and in turn, the shipments made by the

---

**1.** Based on the Ninth Circuit's opinion, the Court construes the scope of coverage provision liberally in favor of Airborne. *See Airborne,* 472 F.3d at 636 (citing *Phil Schroeder,* *Inc. v. Royal Globe Ins. Co.,* 99 Wash.2d 65, 69, 659 P.2d 509 (1983)).

**2.** Subject to a showing that there was "actual negligence."

USPS are not covered by St. Paul under paragraph 2 in Section II (Cargo Legal Liability) of the Insurance Policy.

Although the Ninth Circuit framed two issues of material fact for determination on remand, as explained above, these two issues are properly collapsed into a single agency question because "whether Airborne retained responsibility and liability" under the Insurance Policy depends on whether the USPS is considered Airborne's agent under the Airborne's Service Guide, as incorporated by the @Home Service Agreements. *See Airborne,* 472 F.3d at 635. Accordingly, the Court considers below whether the USPS is Airborne's agent.

### 1. Is the USPS Airborne's agent?

■■■ "[T]he question of agency should be submitted to the jury unless the facts are clearly insufficient to establish agency or there is no dispute as to the underlying facts." *Harris v. Itzhaki,* 183 F.3d 1043, 1054 (9th Cir.1999) (citing *Cabrera v. Jakabovitz,* 24 F.3d 372, 386 (2d Cir.1994)). However, "[w]hen material facts relevant to the question of agency are undisputed and susceptible of only one interpretation, the question of agency is a question of law that may be decided by the Court on summary judgment." *Veeder v. NC Machinery Co.,* 720 F.Supp. 847, 850 (W.D.Wash. 1989); *Kelsey Lane Homeowners Ass'n v. Kelsey Lane Co., Inc.,* 125 Wash.App. 227, 236, 103 P.3d 1256 (2005) ("Agency is generally a question of fact reserved for a jury unless the facts are undisputed or permit only one conclusion."). After the Ninth Circuit remanded this case, the parties supplemented the record with facts demonstrating the nature of Airborne's relationship with the USPS. One of the diffi-

culties the Ninth Circuit faced on appeal was the fact that the agreement between USPS and Airborne was not part of the record. *See Airborne,* 472 F.3d at 636 ("[T]he contract between Airborne and USPS is not part of the record[.]"). The record now, however, includes the agreement between Airborne and the USPS (Dkt. # 55; Ex. A) and the Declaration of David M. Stachovitz (Dkt.# 60), a USPS Business Mailer Support Analyst, and the Declaration of David Loonam (Dkt.# 55), who worked in developing the @Home delivery program. Based on the supplemented record, and viewing the evidence in the light most favorable to Airborne as the non-moving party, the Court finds that there are no genuine issues of material fact regarding the USPS's relationship with Airborne and the facts are insufficient to establish an agency relationship between Airborne and the USPS under Washington law. *See* Fed.R.Civ.P. 56(c); *Moran v. Selig,* 447 F.3d 748, 753 (9th Cir.2006); *Enron Oil Trading & Trans. Co. v. Walbrook Ins. Co., Ltd.,* 132 F.3d 526, 528 (9th Cir.1997) ("Because this action was removed to the district court under diversity jurisdiction, the substantive law of . . . the forum state, applies.").

### a. The USPS agreement and Alternate Mailing System

In 1999, Airborne pursued an arrangement with the USPS involving Airborne's use of the USPS to complete the final leg in the delivery process for packages being shipped by Airborne for its customers. *See* Dkt. # 55 (Loonam Decl.) at ¶ 2. Ultimately, in July of 1999, Airborne and the USPS entered into an Alternate Mailing System Agreement. *Id.;* Ex. A (the "AMS Agreement").[3]

---

**3.** In 2000, the AMS Agreement was amended to address specific technical issues involving the procedure governing deposits, documen-

tation and the reconciliation of account payments. *See* Dkt. # 55 at ¶ 2. The amendment was executed through Airborne's August 18,

An AMS Agreement is executed so that a mailer (Airborne in this case) can use the USPS's Alternate Mailing System. *See* Domestic Mail Manual § 705.4.2.2(b) ("Authorization to use AMS must include a signed AMS agreement[.]").[4] An Alternate Mailing System "provides for other methods of accepting permit imprint mail . . . that show proper postage payment and mail preparation without verification by weight." *Id.* at § 705.4.1.1. In essence, the purpose of the Alternate Mail System is to give a mailer a convenient way to pay postage. *See id.* at 705.4.2.1 (Authorization Procedure) ("A mailer may request authorization to pay postage by an AMS by submitting a written request to the postmaster at the office of mailing."). Under the Domestic Mail Manual, a mailer's use of AMS must benefit the USPS and must not burden the USPS with any additional cost "beyond the costs of current mail acceptance procedures for the mail in question." *Id.* at 705.4.2.2(a), (e). Although Airborne and the USPS executed an AMS Agreement, as discussed in section II.B.1.c below, this contractual relationship did not create an agency relationship between Airborne and the USPS.

### b. Agency law

The Washington Supreme Court has repeatedly held that an agency relationship requires that one party be subject to another party's control. *See Nordstrom Credit, Inc. v. Dep't of Revenue,* 120 Wash.2d 935, 941, 845 P.2d 1331 (1993) ("Agency requires that both parties consent to the relationship and that the principal exercise control over the agent. . . . Because Credit did not control any of Nordstrom's business activities, we hold that Nordstrom did not act as Credit's agent[.]") (internal citations omitted); *Matsumura v. Eilert,* 74 Wash.2d 362, 368, 444 P.2d 806 (1968) ("[A]gency does not come into existence out of thin air. It does not exist unless the facts, either expressly or by inference, establish that one person is acting at the instance of and in some material degree under the direction and control of the other.") (citing Restatement (Second) of Agency § 1 (1958)); *Walter v. Everett Sch. Dist. No. 24,* 195 Wash. 45, 48, 79 P.2d 689 (1938) ("Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.") (quoting Restatement of Agency § 1). The Ninth Circuit, interpreting Washington law, has also held that agency requires the principal's exercise of control over the agent. *See Scott v. Ross,* 140 F.3d 1275, 1281 (9th Cir.1998) ("In addition, 'agency requires that both parties consent to the relationship and that the principal exercise control over the agent.' ") (quoting *Nordstrom,* 120 Wash.2d at 941, 845 P.2d 1331).

■ The Ninth Circuit stated in its opinion in this case that "[a] third party carrier serving under contract can function as an 'agent' of the primary carrier, even

2000 letter and the USPS response letter on September 6, 2000. *See* Dkt. # 55 at Ex. B, C.

4. The Alternative Mailing System is described in the USPS's Domestic Mail Manual. *See* Domestic Mail Manual, *available at* http://pe.usps.gov/text/dmm300/dmm300—landing.htm. Because the Domestic Mail Manual is incorporated by reference into 39 C.F.R. § 111.1, the Court takes judicial notice of the Domestic Mail Manual, specifically the regulations relating to the Alternative Mailing System. *See* 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed. . . ."); *Mora v. Vasquez (In re Mora),* 199 F.3d 1024, 1028 n. 7 (9th Cir.1999) (judicially noticing postal regulations from the Domestic Mail Manual as incorporated by 39 C.F.R. § 111.1).

where the primary carrier does not control the manner of the agent's performance and would not be liable for the agent's independent torts on a *respondeat superior* theory." *Airborne*, 472 F.3d at 636. The Ninth Circuit, however, made this statement in the context of discussing the Insurance Policy's "care, custody and control" provision, explaining "[n]or is 'care, custody, or control' dependent on a formal agency relationship between the primary carrier and any independent contractors." *Id.* In so doing, the Ninth Circuit was expressing that the "care, custody, and control" provision was not equivalent to a formal agency relationship. The Ninth Circuit, expressly did not say, however, that a principal-agent relationship can exist without the principal having some manner of control over an agent.[5] To the contrary, as stated above the Ninth Circuit has held, following the Washington Supreme Court, that a principal-agent relationship requires the principal's control over the agent. *See Scott,* 140 F.3d at 1281; *see also Batzel v. Smith,* 333 F.3d 1018, 1035 (9th Cir.2003) (" 'Agency is the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.' ") (quoting Restatement (Third) of Agency § 1.01 (Tentative Draft)).

### c. Agency law as applied to the USPS and Airborne relationship

As explained above, an agency relationship requires some material degree of control by the principal over the agent. In this case, however, the facts show that the

---

5. In stating that "[a] third party carrier serving under contract can function as an 'agent' of the primary carrier, *even where the primary carrier does not control the manner of the agent's performance* and would not be liable for the agent's independent torts on a *respondeat superior* theory," the Ninth Circuit cited specifically to footnote 36 from *O'Brien v. Hafer,* 122 Wash.App. 279, 288, 93 P.3d 930 (2004). *Airborne,* 472 F.3d at 636 (emphasis added). Footnote 36 discusses the distinction between a servant and a nonservant agent. In describing this distinction, the Washington Court of Appeals stated: "This [a servant] is to be distinguished from a nonservant agent who 'aids in the business enterprise' but is not a part of it.... The nonservant agent agrees sometimes to render services and sometimes to achieve results, but he does not surrender control over his physical actions." *Id.* (quoting Restatement (Second) of Agency § 218, Title B, Torts of Servants, Introductory Note at 479 (1958)). The Introductory Note from the Restatement quoted by the Washington Court of Appeals, however, goes on to state: "Household servants and full time employees of a business are typical of the servant group; factors, brokers and attorneys at law represent the non-servant type of agents. These are to be distinguished from other non-ser-vants who are employed to do work but not in a fiduciary capacity and who can be classified as *non-agent* independent contractors." *Id.* (emphasis added).

Under the Restatement (Second) of Agency, even if a principal does not have control over the *physical actions* of a nonservant agent, in order for a principal-agent relationship to exist, the principal must still have some manner of material control over the agent. Section 14N of the Restatement explains: "Agent and Independent Contractor. One who contracts to act on behalf of another and *subject to the other's control except with respect to his physical conduct* is an agent and also an independent contractor." As discussed below in section II.B.1.c, the USPS is best characterized as Airborne's "non-agent independent contractor" as explained by comment b in § 14N of the Restatement (Second), which states: "*Non-agent independent contractor.* A person who contracts to accomplish something for another *or to deliver something to another, but who is not acting as a fiduciary for the other* " (emphasis added). In this case, the USPS contracted to deliver something to another and was not acting as Airborne's fiduciary. Thus, under the Restatement § 14N, the USPS was a "*non-agent* independent contractor" for Airborne.

USPS was not materially subject to Airborne's control. First, Airborne could not withhold payment from the USPS because under the AMS Agreement, Airborne had to maintain sufficient funds on deposit to cover the postage charges for any mailings made. *See* Dkt. # 55; Ex. A at ¶ 4; ¶ 5 ("Postage will be paid through a CAPS trust account[.]").

Second, Airborne did not control the manner of the USPS's delivery. The packages were sent "Standard Mail (B) Parcel Post." *Id.* at ¶ 13. Airborne simply dropped the packages at the appropriate Destination Delivery Unit postal facility, and the USPS sent the packages parcel post. *Id.;* Dkt. # 60 (Stachovitz Decl.) at 2. The agreement between Airborne and the USPS "allowed for the tender of large numbers of packages for mailing without requiring Airborne Express representatives to present the packages 'over the counter' at individual post offices." Dkt. # 60 at ¶ 5. The AMS agreement did not create any different relationship between Airborne and the USPS with respect to the delivery of packages than what exists between the postal service and any other postal customer that places a package or letter in the mail for delivery. *Id.* at ¶ 8.

The lack of Airborne's control over the USPS was expressed during the deposition of Airborne's Fed.R.Civ.P. 30(b)(6) designee, Lynn Gregorich. As Ms. Gregorich explained in her June 16, 2004 deposition, once Airborne delivered a package to the USPS, Airborne lost all control over it:

Q. *Once Airborne delivered a package to the Postal Service, there was no way to know what the Postal Service did with it?*

A. *That's correct.*

Dkt. # 19–4 at 5 (Gregorich Dep. 62:15–18) (emphasis added). Later in her deposition, Ms. Gregorich explained that once the

USPS acknowledged receipt of a package, Airborne got "nothing beyond that":

Q. Do you know of any controls whatsoever the Postal Service had on the packages delivered by Airborne to them? Airborne or the Postal Service didn't know what happened to the package?

A. I don't know what accountability they had within their own system, I don't know what their accountability is for that. *But Airborne knew that when we gave it to them, that we were going to get their signature at the Post Office and nothing beyond that.*

*Id.* (Gregorich Dep. 63:2–10). Based on these facts and the AMS Agreement, the Court finds that Airborne did not control the relevant manner of performance, in this case the actual delivery of the package from the USPS to the consignee. *See Bloedel Timberlands Dev., Inc. v. Timber Indus., Inc.,* 28 Wash.App. 669, 674, 626 P.2d 30 (1981) ("The crucial factor is the right of control which must exist to prove agency.... [C]ontrol establishes agency only if the principal controls the manner of performance, in this case the actual cutting.").

Third, the Court's finding that Airborne lacked control over the USPS is consistent with the terms of Airborne@Home Service Agreements. Under the @Home Service Agreements with NFI and Sur La Table, once Airborne tendered a package to the USPS, Airborne lost control over the package to the extent that if a consignee returned a package, the return had to be processed through the USPS exclusively. Airborne was only involved if requested, which constituted a new transaction by the shipper. *See* Dkt. # 59; Ex. 1, ¶ 47 ("Shipments unopened by a final consignee may be returned via USPS to the shipper in accordance with USPS Standard B terms and conditions. When Airborne ser-

vices are requested as a returns or refusal process by a final consignee, services rendered shall be considered a new transaction and be subject to the terms and conditions of the service requested.").

Finally, given that the USPS's relationship with Airborne was similar to the USPS's relationship with any mail-sender, a finding in this case that the USPS was an agent of Airborne would suggest that the USPS is an agent for every mail-sender, and would also mean that St. Paul was insuring the USPS's actions. *See* Dkt. # 60 at ¶ 8 ("The [AMS] Agreement did not create any different relationship between Airborne and the Postal Service than what exists between the Postal Service and any other entity that places a package or letter into the mail for delivery."). Neither of these propositions can stand. Concluding here that the USPS and Airborne have an agency relationship would mean that the USPS is potentially liable to Airborne as its agent. The USPS has not, however, consented to this his type of agency liability. *See, e.g., Shull v. United States*, 228 Ct.Cl. 750, 763 (Ct.Cl. 1981) ("We have consistently held that the United States is liable to the owners of lost or damaged mail only to the extent that it has consented to be liable.") (citing *Twentier v. United States*, 124 Ct.Cl. 244, 249, 109 F.Supp. 406 (Ct.Cl.1953) ("Under the Postal Laws and Regulations, no liability exists on the part of defendant for the loss of or damage to mail of the type here involved. In order to secure protection against loss or damage, it is necessary to use registered, insured, or c.o.d. mail.")). The scope of the USPS's liability is contained in § 609 of the Domestic Mail Manual, which states, "A customer may file an indemnity claim for insured, collect on delivery (COD), registered with postal insurance, or Express Mail." *See* Domestic Mail Manual, § 609. 1.1 (Extra Services with Indemnity). Concluding in this case that

St. Paul is liable would effectively make them an insurer for the USPS, despite the fact that Airborne decided not to send the NFI and Sur La Table packages via USPS insured, registered, or Express Mail. *See* Dkt. # 55 (Loonam Decl.) at ¶ 4 ("The USPS Agreement did not provide for the use of Registered Mail, COD, or Express Mail, nor did Airborne purchase insurance from the USPS for the packages[.]").

### d. Airborne's assertions

In its motion and reply, Airborne makes two fundamental arguments to support its claim that St. Paul is liable under the Insurance Policy. First, Airborne argues that because the USPS and Airborne had a contract, St. Paul must be liable for the USPS's actions. *See* Motion at 8 ("[T]he USPS was acting as a contract agent for Airborne during the last leg of Airborne's delivery of packages for NFI and Sur La Table under a written contract with the USPS[.]"); Reply at 5 ("The question on remand is whether Airborne and USPS were proceeding under a contract. The answer is a definite yes—the USPS Agreement."). Second, Airborne argues because the USPS was not liable for the shipments, Airborne must be liable for them, and therefore Airborne is covered by the Insurance Policy. *See* Motion at 8 ("Airborne was legally liable for those packages [the NFI and Sur La Table packages], and the USPS was not so liable.").

Airborne's first assertion, claiming that USPS was its "contract agent" conflates a contractual relationship with an agency relationship. Just because the USPS had an AMS Agreement with Airborne does not mean that the USPS was also Airborne's "agent." *See Bloedel*, 28 Wash.App. at 674, 626 P.2d 30 ("The crucial factor is the right of control which must exist to prove agency. Control is not established if the asserted principal retains the right to su-

pervise the asserted agent merely to determine if the agent performs in conformity with the contract."). The Ninth Circuit has also held that requiring a contracting party to perform under a contract does not, by itself, establish an agency relationship.[6] The Court finds that while the USPS and Airborne had a contract, the USPS is best characterized as a *non-agent* independent contractor for Airborne.

Concluding that the USPS was not an agent for Airborne in this case is also consistent with other decisions where courts have examined contracts between shippers and carriers and have not found an agency relationship. *See Prof'l Commc'ns, Inc. v. Contract Freighters, Inc.*, 171 F.Supp.2d 546, 551 (D.Md.2001) ("In this case, the plaintiffs have not produced any evidence that the relationship between Covenant and Contract Freighters was anything more than a business contract to ship goods. A mere contract to ship goods does not establish an agency relationship."); *see also Acme Delivery Serv., Inc. v. United States*, 817 F.Supp. 889, 893 (D.Colo.1993) (concluding there was no principal/agency relationship as a matter of law because the contracts with the government were straight-forward agreements for the transportation of household goods and unaccompanied baggage).

Airborne's second assertion that the USPS is not liable for the NFI and Sur La Table deliveries is irrelevant for answering the question of whether Airborne is liable. Airborne misconstrues the Ninth Circuit's opinion to mean absence of liability on the part of the USPS creates liability for Airborne. However, even if the USPS was not liable for the shipments, it does not mean that Airborne was liable for the shipments. The scope of Airborne's liability to NFI and Sur La Table is contained in their Service Agreement. The Service Agreement expressly states that Airborne is only liable for the actions of itself, its employees, or its agents. *See* Dkt. # 23, Ex. A at 8. As the Court found above, the USPS was not Airborne's agent, therefore Airborne was not liable to NFI and Sur La Table, which results in no coverage for Airborne under the Insurance Policy.

## III. CONCLUSION

In summary, the material facts relevant to the question of agency are undisputed and susceptible of only one interpretation: the USPS was not subject to Airborne's control and therefore was not Airborne's agent. The issue of agency in this case, therefore, is a question of law that may be decided by the Court on summary judgment.[7] Because the Court finds that the

6. *See In re: Coupon Clearing Serv., Inc.*, 113 F.3d 1091, 1100 (9th Cir.1997) ("It is well-established that one who contracts to act on another's behalf and is subject to another's control, except with respect to his physical control, may still be acting as an agent and also as an independent contractor.... Comment b states that, '[a] person who contracts to accomplish something for another or to deliver something to another, but who is not acting as a fiduciary for the other is a non-agent contractor.' Restatement (Second) of Agency § 14N cmt. b (1958). The ShopRite Retailers' only right of control with respect to CCS was to require CCS to perform its contracts. Consequently, we conclude that no

agency relationship existed between CCS and the ShopRite Retailers as the retailers lacked the requisite control over CCS to establish such a relationship.").

7. Should Airborne appeal this matter again to the Ninth Circuit Court of Appeals, the Court urges the Ninth Circuit to fully resolve the case, as both parties agree the record is complete and there are no remaining issues of fact for resolution at the trial-court level. *See* Motion at 1–2 ("There are no genuine issues of material fact"); Response at 4–5 ("Airborne's own documents, its master contract with the United States Postal Service, and the Stachovitz declaration resolve any material

USPS was not Airborne's agent, the losses are not covered by the Insurance Policy with St. Paul. While it is true that Airborne and the USPS had an Alternate Mailing System Agreement, a contract without more is not enough to find that USPS was Airborne's agent in this case.

For of the foregoing reasons, the Court GRANTS St. Paul's motion for summary judgment (Dkt.# 58) and DENIES Airborne's motion for summary judgment (Dkt.# 54). The Clerk of Court is directed to enter judgment in favor of St. Paul and against Airborne.

factual disputes concerning the remanded issues."); Response at 19 ("The record is complete.").